UNITED STATES of America,
Plaintiff–Appellee,

v.

Antoine SEGINES (92–4051); Michael Alston (92–4059); Adrian Ayers (92–4060), Defendants–Appellants.

Nos. 92–4051, 92–4059, 92–4060.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 7, 1993.

Decided Feb. 23, 1994.

Blas E. Serrano, Asst. U.S. Atty. (Briefed and Argued), Cleveland, OH, for U.S.

Roger M. Synenberg (Briefed and Argued), Synenberg & Marein, Cleveland, OH, for Michael Alston.

Donald Krosin (Argued and Briefed), Federal Public Defender's Office, Cleveland, OH, for Antoine Segines.

Jacqueline A. Johnson (Argued and Briefed), Graves, Haley, Horton & Muttalib, Cleveland, OH, for Adrian Ayers.

Before: KEITH and JONES, Circuit Judges; and BROWN, Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

The three defendants in this case, Antoine Segines, Michael Alston, and Adrian Ayers, were convicted by jury verdict on charges of conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846; of distributing cocaine base, in violation of 21 U.S.C. § 841(a)(1); and of committing these acts within 100 feet of a video arcade, in violation of 21 U.S.C. § 860(a). Ayers was sentenced to incarceration for a period of 400 months, Segines received a sentence of 292 months and Ayers received 262 months. The appellants claim errors in the trial, properly preserved for appeal. They also contend that statements made by the trial judge had such a "chilling effect" upon defense counsel that they constituted "plain error," denying their right to a fair trial.[1]

The claims of error that were expressly preserved for appeal are that the trial court improperly: (1) admitted into evidence a composite tape recording; (2) allowed the jurors to use a written transcript of that composite tape, prepared by the government, to help them in deciphering the tape's contents; (3) after properly excluding from admission into evidence the original tapes, from which the composite tape was made, allowed the jurors to listen to those tapes during their deliberations; (4) limited the defendants' right to fully cross-examine the government's "star" witness and failed to properly restrict the scope of the redirect examination of that same witness; (5) failed to grant a judgment of acquittal on the conspiracy count of the indictment; and (6) failed to give a requested "multiple conspiracies" instruction to the jury. Appellants raise several other issues, most of which concern their sentencing levels.

We agree with the appellants that they should be given a **NEW TRIAL.** We reach this conclusion because of the comments made by the trial judge, of which we take cognizance under the "plain error" doctrine, that revealed such bias towards defense counsel as to deny the defendants their fundamental right to a fair trial.[2] In remanding this case for a new trial, we also rule on the admissibility of the original tapes, the composite tape, the transcript, and other evidence at issue in the first trial.

I

Alston and Ayers came under investigation in September 1991 by members of the Caribbean/Gang Task Force in Cleveland, Ohio. Four separate "controlled drug purchases" were made at 6325 Carl Avenue, a residence owned by Ayers, during the period spanning September 30 through December 5, 1991. These purchases involved the use of a cooperating individual ("CI") who was, prior to each transaction, searched by the authorities to insure that he had no money or drugs in his possession. He was issued money, for which the serial numbers had been recorded, so that he could purchase the drugs. He was then placed under continual surveillance until he entered the Carl Avenue residence. If he drove his own vehicle to Carl Avenue, that

---

1. The appellants first asserted this claim of error on appeal.

2. It appears that such comments, at least in part, were related to the district judge's desire to move the trial along, and we are aware that the judge had recently joined the federal judiciary and had inherited a very large docket of pending cases.

vehicle was also searched prior to the purchase. Once the transaction had been completed, the drugs and any money not used in the purchase were turned over to the authorities. This CI did not testify at the trial.

A search warrant was executed at the Carl Avenue residence on December 6, 1991, at which time only Alston and Ayers were present. As law enforcement agents entered, they observed Ayers throwing bags of marijuana and Alston throwing a small scale onto the floor. The scale was later found to have cocaine residue on it.

On February 11, 1992, Robert Smith, a cooperating government informant who later became the government's "star" witness in this case, made a controlled purchase of one-half ounce of crack cocaine from Ayers at the A & A Gameroom, a video arcade owned and operated by Ayers' sister. Smith testified that Ayers called Alston to bring the cocaine needed to conclude the transaction, which Alston did. Also present was Segines, who produced a large bag of cocaine rocks and handed it to Ayers, so that Ayers and Smith could complete their transaction. Smith made similar purchases from Ayers and Segines during the remainder of the month of February 1992. A total of approximately 103 grams of cocaine base was purchased in these transactions. The indictment against the three defendants alleged a conspiracy dating from September 1991 through February 27, 1992. On March 12 and March 13, 1992, Smith made further cocaine purchases from Segines at an apartment located on Linn Drive. These latter transactions were not included as separate counts in the indictment, but testimony concerning them was admitted at trial.

## II

### A. THE PLAIN ERROR DOCTRINE

■ We begin with the well-established principle that a defendant is entitled to "a fair trial, not a perfect one," *Delaware v. Van Arsdall,* 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986), because an "error-free, perfect trial" is not humanly possible. *United States v. Hasting,* 461 U.S. 499, 508, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96

(1983). To implement this principle, Congress and the federal courts have developed the "harmless error" doctrine, which "'block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.'" *Id.* (quoting *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)); *see also* FedR.Crim.P. 52(a) (directing courts to disregard harmless errors, i.e., "[a]ny error, defect, irregularity or variance which does not affect substantial rights"). Moreover, this harmless error analysis applies even to constitutional errors, provided that they are so "unimportant and insignificant" as not to affect a defendant's substantial rights. *Hasting,* 461 U.S. at 508, 103 S.Ct. at 1980; *see Chapman,* 386 U.S. at 23, 87 S.Ct. at 827–28. A reviewing court engages in harmless error analysis under Rule 52(a) only when alleged errors are properly preserved both at trial and on appeal.

■ The converse of harmless error is embodied in the "plain error" doctrine: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Fed.R.Crim.P. 52(b). The Supreme Court has recently analyzed the "single category of forfeited-but-reversible error" provided for by Rule 52(b). *United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508 (1993), *construed in United States v. Thomas,* 11 F.3d 620 (6th Cir.1993). Appellate authority "under Rule 52(b) is limited in three significant respects." *Thomas,* 11 F.3d at 629 (citing *Olano,* — U.S. at —, 113 S.Ct. at 1777). First, there must have "indeed been an 'error.'" *Olano,* — U.S. at —, 113 S.Ct. at 1777. Second, the error must be "plain," i.e., "clear" or "obvious." *Id.* Third, the plain error must have affected "substantial rights." *Id.* — U.S. at —, 113 S.Ct. at 1777–78. In most cases, a reviewing court must find the "plain error" to have been prejudicial to the defendant, using the same "harmless error" analysis as required by Rule 52(a), "with one important difference: It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.*

— U.S. at ——, 113 S.Ct. at 1778. The Supreme Court has stopped short, however, of establishing a blanket rule that shifts the burden of persuasion onto the defendant in all cases. "There may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome.... [There also may be] errors that should be *presumed prejudicial* if the defendant cannot make a specific showing of prejudice." *Id.* (emphasis added).

■ The Court emphasized the discretionary nature of the plain error doctrine: "The Court of Appeals should correct a plain forfeited error affecting substantial rights [only] if the error 'seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Olano,* —— U.S. at ——, 113 S.Ct. at 1779 (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). This discretionary application of Rule 52(b), however, does not require that a defendant be "actually innocent." *Id.* The *Thomas* court summarized the four-part process of analysis that we must undertake pursuant to Rule 52(b):

> First, we are to consider whether an error occurred in the district court. Absent any error, our inquiry is at an end. However, if an error occurred, we then consider if the error was plain. If it is, then we proceed to inquire whether the plain error affects substantial rights. Finally, even if all three factors exist, we must then consider whether to exercise our discretionary power under Rule 52(b), or in other words, we must decide whether the plain error affecting substantial rights seriously affected the fairness, integrity or public reputation of judicial proceedings.

*Thomas,* 11 F.3d at 630.

## B. TRIAL COURT CONDUCT

■ Our precedents reveal that we have found violations of a defendant's due process rights under circumstances similar to those reflected in the record of this case. In *United States v. Poindexter,* 942 F.2d 354, 360 (6th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 615, 116 L.Ed.2d 637 (1991), we overturned a conviction in part because of the trial judge's "scathing" criticism of defense counsel, which we presumed for purposes of review to have occurred in the presence of the jury. Likewise, in *United States v. Kelley,* 314 F.2d 461 (6th Cir.1963), we found that the trial judge's threats against defense counsel during trial were so intimidating to the defendant's presentation of a proper defense as to violate due process. In *United States v. Koenig,* 300 F.2d 377 (6th Cir.1962), we held that "the United States District Judge overstepped the bounds of judicial propriety," *id.* at 378, by demonstrating "an extremely hostile attitude toward the defendants and their counsel." *Id.* at 380. In *Rocha v. Great American Insurance Co.,* 850 F.2d 1095 (6th Cir.1988), we stated that "'the remarks of the judge during the course of a trial, or his manner of handling the trial, clearly indicat[ing] a hostility to one of the parties,'" can be the basis for a finding of "plain, i.e., reversible, error." *Id.* at 1100 (quoting *Knapp v. Kinsey,* 232 F.2d 458 (6th Cir.), *cert. denied,* 352 U.S. 892, 77 S.Ct. 131, 1 L.Ed.2d 86 (1956)).

The first indication of the trial judge's hostility towards the defendants in this case came during a pre-trial conference. Ms. Johnson, counsel for defendant Ayers, was asked to stipulate as to her client's prior criminal record. When she refused, the following exchange occurred:

> THE COURT: In other words, you want somebody from the Clerk of Courts office to trace [sic] over and bring the records [of Ayers' criminal history] with them?
>
> MS. JOHNSON: Yes.
>
> THE COURT: All right. *But I will take that into account on the sentencing.*
>
> MS. JOHNSON: Excuse me. Your Honor, I don't know what that means, you may take that into account.
>
> THE COURT: I do not believe in unnecessarily forcing people to come into court to testify to things that are basically fact. And if that becomes necessary, and if that is done with no reason whatsoever, *I will take it into account.*

*Trial Transcript* at 20–21 (emphasis added).

Instances of the judge's hostility toward defense counsel multiplied throughout the trial. On the first day of the proceedings,

Ms. Johnson was attempting to have certain testimony of a government witness stricken as irrelevant and prejudicial. The court interrupted her by stating: "We can't have motions all the time. We've got to get this thing going." *Trial Transcript* at 171. Later, when Mr. Krosin, counsel for Segines, attempted to impeach Smith, the government's key witness, with certain facts about his past involvement in a witness protection program, the court admonished him in the following terms: "No. I sustained the objection to that. *Now, if you can't ask the right questions I'll put somebody else up there to ask questions.*" *Trial Transcript* at 486 (emphasis added).

The most egregious incident reflecting the trial judge's intimidation of defense counsel occurred on the third day of the trial, after the completion of redirect and recross-examination of Smith. The record reveals that during this time the four defense attorneys[3] had been making their best efforts to impeach Smith and to prevent the introduction of certain parts of his testimony, elicited upon redirect examination, that they deemed extremely prejudicial to their clients. The outcome of the case certainly hinged in large part upon the credibility of Smith's testimony and upon the defense counsels' attempts to impeach him. In this highly-charged atmosphere, the court made the following statement:

THE COURT: Let the record show that the jury has left the room. I will now allow anyone to put on the record without my presence anything they wish to. I would also like to say that individually you are all fine people, *but collectively you're being extremely obnoxious in this case.* I do not know why it is necessary to repeat questions constantly over and over and over again. This testimony has taken twice as long as it should have.

Furthermore, you have deliberately disregarded my ruling in this case. When I make a ruling I expect that ruling to be

obeyed whether you like it or not. If you don't like it, you can take it to the Sixth Circuit. And when an objection is made, it only needs to be made once, it does not need to be made repeatedly. Now, you may put anything on the record you wish.

*Trial Transcript* at 607 (emphasis added). Once the judge had left the courtroom, all four defense attorneys moved for a mistrial based upon the admission of prejudicial material and the limitation of the right of cross-examination. *Id.* at 608–09.

Applying the plain error doctrine, we find that the attitude and comments of the trial judge violated defendants' due process rights to a fair trial. We make this finding based upon the presumptively "chilling effect" of the judge's comments upon the conduct of the trial by defense counsel. As such, we do not require appellants to make a specific showing of this effect.

### III

We turn now to various evidentiary issues which are certain to arise at the new trial.

### A. THE TAPES AND TRANSCRIPT

Several tape recordings were made from a "wire" worn by Smith during six controlled drug purchases occurring in February 1992. A composite tape was created by the government out of what it contended to be the intelligible and relevant portions of six of the original tapes, and this composite tape, over objection, was admitted into evidence and played at trial. A transcript of this tape was prepared by the government as an aid to the jury, and over objection, was used by the jury at trial, but was neither formally admitted into evidence nor sent to the jurors to aid in their deliberations. The original tapes, although expressly excluded from admission into evidence, were made available by the court, again over objection, when the jurors requested to listen to them during their deliberations.[4]

---

3. Only three of the original defendants have appealed the jury verdict. The fourth defendant was found not guilty.

4. It had earlier been agreed among the parties that the original tapes would not be made avail-

able for use by the jury. In response to the defendants' objections to the introduction into evidence of the composite tape, the court had stated: "It will be my ruling that the composite tape which was listened to in the courtroom will

### 1. THE COMPOSITE TAPE

 As a general rule, "[t]aped recordings are admissible unless the incomprehensible portions of the tapes are so substantial as to render the recordings as a whole untrustworthy." *United States v. West*, 948 F.2d 1042, 1044 (6th Cir.1991) (citing *United States v. Robinson*, 763 F.2d 778, 781 (6th Cir.1985) ("*Robinson II*")), *cert. denied*, — U.S. —, 112 S.Ct. 1209, 117 L.Ed.2d 447 (1992). The decision to admit tapes, including a composite tape, is within the sound discretion of the trial judge. A composite is admissible, assuming that it clears the intelligibility hurdle, when it saves the trial court "much time and inconvenience" and when "the prosecution [has] laid the proper foundation on the accuracy and authenticity of the composite tape for its admission into evidence" and has complied with the requirements of Federal Rule of Evidence 1006.[5] *United States v. Denton*, 556 F.2d 811, 816 (6th Cir.1977); *see also Robinson II*, 763 F.2d at 781.

 Informant Smith and Agent Brock, the latter being the member of the Caribbean/Gang Task Force in charge of the transcription, testified concerning the means of preparation of the composite tape and of the accompanying transcript. Brock stated that the composite tape was made so that "instead of having hours of video machines playing [in the arcade], you have more concise tapes

with the pertinent relevant conversations on it." This testimony provided an adequate foundation to show that the composite tape was an accurate representation of the originals. Moreover, there was no suggestion by appellants that they had not been given a "reasonable time and place" to examine both the original tapes as well as the composite. *See* Fed.R.Evid. 1006.

### 2. THE TRANSCRIPT

 The use of a transcript of taped recordings is permissible as an aid to the jury, within the discretion of the trial court, when certain procedures are followed for determining its accuracy. *West*, 948 F.2d at 1044. The preferred method is stipulation to its accuracy by all parties. The next best alternative is for the transcriber to attest to its accuracy and for the court to test that accuracy, outside of the jury's presence, "by reading the transcripts while listening to the tapes." *Id.* When tapes are unintelligible, however, a transcript intended as an aid to the jury inevitably becomes, in the minds of the jurors, the evidence itself. *United States v. Robinson*, 707 F.2d 872, 878 (6th Cir.1983) ("*Robinson I*"). As is required whenever a transcript is used and there is no stipulation as to its accuracy, the trial court here gave a cautionary instruction to the jury regarding the limited use to be made of the transcript.[6] Such an instruction does not suffice, however, to erase the prejudice created by "[s]hepherding hearsay to the jury via the transcripts...."[7] *Id.*

be admitted as evidence. The other tapes [the original tape recordings] will be placed in the record for availability by the reviewing court, *but will not be admitted as exhibits.*" *Trial Transcript* at 871–72 (emphasis added).

5. "The contents of voluminous ... recordings ... may be presented in the form of a ... summary.... The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place." Fed.R.Evid. 1006.

6. First of all, the transcript is not evidence. The tape recording is the only evidence. The transcript is prepared to try to help you follow the recording as you hear it. However, you are to be the judges of what the recording says and whether the transcript accurately reflects what

the recording says. You are to be the judge of the voices that you hear on the transcript. You are not to read ahead of the transcript. You are to follow it strictly as you hear the recordings through the ear phone.
The transcript is not evidence.
*Trial Transcript* at 401–02.

7. Commenting upon a jury instruction similar to the one given here ("The tapes, however, are evidence in the case and the transcripts are not evidence. If you perceive any variation, you will be guided solely by the tapes and not the transcripts."), the *Robinson I* court stated:

While this is an adequate instruction, its directives are only viable when the tape is clear enough for a juror to detect that the tape is at variance with the transcript. But where, as

Since a joint stipulation as to the accuracy of the transcript in this case was impossible, the trial court attempted to follow the backup procedure outlined above. Agent Brock testified that he and Smith had listened to the tapes "three or four times to get the transcript as accurate as we could." A conference was held among all attorneys, with the court leading the discussion of whether the transcript should be used and if so how it should read, based upon a close listening to the composite tape itself. The trial judge, however, made some very problematic statements regarding the tape. He stated, for instance, that "[t]hat just goes to show how inaccurate the transcript is." *Trial Transcript* at 134. Later, he said that "[w]ithout a transcript much of this would be unintelligible. You've got to have a transcript for the jury to make anything out of this.... The transcript is a guide. With the transcript you can make out the words on the tape." *Id.* at 140.

On one occasion, when the tape was simply too unclear to be deciphered, the court allowed its best guess as to its contents to be placed into the transcript, stating: "I can't say that I can make out the rest of it, but there is something there. And if the informant can testify to the fact that that's what was said, then the proper method of challenge is through cross-examination." *Id.* at 135. This occurred more than once during the conference to review the composite tape and transcript. Thus, despite the authentication of accuracy by Agent Brock and despite the judge's repeated cautionary instruction to the jury regarding the limited role of the transcript in the trial, the transcript here suffered from the same defects as in *Robinson I.* We therefore find "the district court's decision to permit juror use of [the] transcripts to be a manifest abuse of discretion." *Robinson I,* 707 F.2d at 879. "The better course would have been for the agents [and informants] involved to testify regarding their recollection of the conversations so that the jury could be afforded an opportunity to assess their credibility." *Id.* at 878.

At retrial, the transcript will not be given to the jury. The comments of the trial court regarding the composite tape's "unintelligibility" make it a close decision as to whether or not to exclude that tape's introduction into

here, the tapes are partially inaudible, the juror is precluded from making an intelligent comparison.

evidence. After carefully listening to the composite tape, however, we conclude that it has sufficient value in its own right to preclude us from usurping the trial court's general discretion regarding the admissibility of tape recordings. Accordingly, we leave it to the trial court to determine how much of the composite tape to admit into evidence, in light of the general rules concerning the admissibility of audio tapes.

## 3. THE ORIGINAL TAPES

Next, we must consider the delivery of the original tapes to the jurors during their deliberations. Defendants argue that there was not a sufficient foundation for the admission of the original tapes into evidence and that therefore it was reversible error for the district court to allow the jury to listen to those tapes, due to the "reasonable possibility of prejudice to the defendant[s]" that was thereby created. The government replies by arguing that a proper foundation had been laid at trial for the introduction into evidence of the original tapes, even though the trial court never formally reviewed their contents nor actually marked them as exhibits. The government further argues that even if the district court abused its discretion by allowing the original tapes to go to the jury room, such error was "harmless beyond a reasonable doubt" and not prejudicial to any of the defendants.

When tapes have not been admitted into evidence, "[a]llowing the jury to take the tape[s] to the jury room [i]s error." *United States v. Scaife,* 749 F.2d 338, 347 (6th Cir.1984). The trial court here did not review the original tapes for intelligibility and authenticity. The court was therefore unprepared to properly admit them into evidence and committed error when it allowed them to go the jury room. Without commenting upon the extent of the harm to the defendants that resulted from this error, we leave it to the discretion of the court upon retrial to rule on the admissibility of these tapes. Allowing the jurors to listen to them without their prior admission into evidence would, of course, again be error.

707 F.2d at 878.

## B. THE TESTIMONY OF SMITH

Ayers argues that his due process right to a fair trial was violated when the trial court allowed Smith's testimony during redirect examination to reveal that his apartment had been "fire bombed by some of Adrian [Ayers'] friends" and that he had injured his hand while trying to escape from "some guys [who] were trying to kill me." *Trial Transcript* at 585–86. On cross-examination, prior to this testimony, defense counsel had attempted to impeach Smith's credibility by eliciting testimony from him to the effect that the government had been supporting him for a period of some three months directly prior to the trial and had even paid for the clothes that he was wearing in court. The government argues that its redirect examination of Smith was necessary to rebut the defendants' suggestion on cross-examination that "Smith was selling his testimony to the government."

■■■■■ "[A] trial judge has broad discretion in determining the scope of redirect examination and in assessing the relevancy of proffered testimony." *United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir.1985). When one party has "opened the door" on an issue, by eliciting prejudicial or inadmissible testimony, "an opponent, in the court's discretion, [may] introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." *United States v. Whitworth*, 856 F.2d 1268, 1285 (9th Cir.1988), *cert. denied*, 489 U.S. 1084, 109 S.Ct. 1541, 103 L.Ed.2d 846 (1989); *see also United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989) (" 'cross-examination attacking a witness's credibility and character will open the door to redirect examination rehabilitating the witness' ") (quoting *United States v. Martinez*, 775 F.2d 31, 37 (2d Cir.1985)). Moreover, "evidence whose probative value might not be thought to outweigh its prejudicial effect if offered on direct examination may well be admitted during redirect examination" for the purposes stated above. *Martinez*, 775 F.2d at 37 (internal quotation marks omitted). Here, the testimony regarding Ayers' alleged plot to kill Smith was, as Ayers claims, prejudicial. However, in light of the defendants' "opening the door" on the question of Smith's need for

government support and protection from harm, the trial court's refusal to strike that redirect testimony from the record was not an abuse of discretion.

## C. PROOF OF THE CONSPIRACY

Segines and Ayers argue that there was not one single conspiracy, but rather several separate conspiracies, each centering around the location from which the drugs were distributed, creating a variance between the indictment and the proof. Segines, for instance, argues four separate conspiracies because drug purchases were made at four separate locations (Ayers' Carl Avenue residence, the A & A Gameroom, the home of Ayers' mother, and the Linn Drive apartment). He moved for a judgment of acquittal as to the conspiracy charge against him, which motion the trial court denied. Segines requested a jury instruction on multiple conspiracies, Sixth Circuit Pattern Criminal Instructions §§ 3.08 and 3.09, but this request was also denied. Ayers also moved for a judgment of acquittal on the conspiracy charge against him, arguing that the government failed to prove that he entered into an agreement to distribute drugs, a necessary element of any conspiracy.

■■■■■ Although the government must of course prove every element of the crimes charged beyond a reasonable doubt, "[w]hether single or multiple conspiracies have been shown is usually a question of fact to be resolved by the jury ... and [is] to be considered on appeal in the light most favorable to the government." *United States v. Schultz*, 855 F.2d 1217, 1222 (6th Cir.1988) (internal quotation marks omitted). "[A] single conspiracy is not transposed into a multiple one simply by lapse of time, change in membership, or a shifting emphasis on its locale of operations." *United States v. Sanchez*, 928 F.2d 1450, 1456 (6th Cir.1991) (internal quotation marks omitted). Moreover, "the government is not required to prove an actual agreement among the various conspirators in order to establish a single conspiracy. In ... a 'chain' conspiracy, the agreement can be inferred from the interdependent nature of the criminal enterprise. Conspiracies to distribute narcotics ... are often 'chain' conspiracies." *United States v. Dav-*

*enport*, 808 F.2d 1212, 1215–16 (6th Cir.1987) (internal quotation marks omitted). Finally, "[p]roof of a formal agreement is unnecessary; a tacit or mutual understanding among the parties is sufficient to show a conspiracy." *Sanchez*, 928 F.2d at 1457.

The law of this circuit permits the defendants to be retried on the conspiracy count as outlined in the original indictment. We emphasize, however, that the trial judge may decide at his discretion whether or not to issue a multiple conspiracies instruction to the jury.

## D. REMAINING ISSUES

Appellants have raised other issues on appeal, including several that concern their sentences. Given our disposition of their appeal, these issues are now moot and can be dealt with at the appropriate time during the course of the new trial.

## IV

We find the remarks of the trial judge concerning defense counsel to have been so egregious as to rise to the level of "forfeited-but-reversible error." For this reason, and for other reasons stated herein, we **VACATE** the judgments of conviction for all appellants and **REMAND** this case for a new trial by the district court.