86 F.3d 1156
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Antoine SEGINES and Adrian Ayres, Defendant-Appellants.
 Nos. 95-3534, 95-3570.
 United States Court of Appeals, Sixth Circuit.
 May 28, 1996.
 
 1
 Before: KENNEDY and COLE, Circuit Judges; and COHN, District Judge.*
 
 
 2
 COHN, District Judge.
 
 
 3
 Defendant-appellants Antoine Segines (Segines) and Adrian Ayers (Ayers) each appeal their conviction and sentence. Segines and Ayers were convicted by a jury of conspiracy to possess with intent to distribute cocaine, 21 U.S.C. § 846, during a period of which conspiracy distributions were made within 100 feet of a video arcade facility, 21 U.S.C. § 860, and possession of cocaine base with intent to distribute, 21 U.S.C. § 841(a)(1). In addition, Ayers was convicted of employing a minor to distribute cocaine base, 21 U.S.C. § 861(a)(1), possession of a firearm by a convicted felon, 18 U.S.C. § 922(g), and possession of a stolen firearm, 18 U.S.C. § 922(j).
 
 
 4
 On appeal, Segines and Ayers argue: (1) the evidence of conspiracy was insufficient; (2) the district court erred in calculating their offense levels in determining that the amount of drugs applicable to the conspiracy was between 150-500 grams based on testimony concerning "a big freezer bag" which was "half full with rocks" of crack cocaine and a "sack full of rocks" with about nine or ten "big, big crack cocaine rocks," and; (3) the district court exceeded the scope of relevant conduct in determining the amount applicable to each of them. Segines also argues that, if anything, there was proof of multiple conspiracies. In addition, Ayers argues that a firearm enhancement was unwarranted and that the evidence that he employed a minor to distribute cocaine base was insufficient because the evidence showed that the minor acted independently. For the reasons that follow, the convictions and sentences of both defendants will be affirmed.
 
 I. Facts
 A. Procedural Background
 
 5
 On March 16, 1992, a federal grand jury returned a multiple-count indictment charging Segines, Ayers and Michael Alston (Alston) with conspiracy to possess with intent to distribute cocaine and possession of cocaine base with intent to distribute. Count I of the indictment contained a specification stating that within a period of the conspiracy distributions were made within 100 feet of a video arcade facility. Ayers and Alston were also charged with employing a minor to distribute cocaine base. In addition, Ayers was charged with possession of a firearm by a convicted felon and possession of a stolen firearm. A jury rendered verdicts of guilty on all but one count against all three defendants. Ayers was acquitted of possession of crack cocaine.
 
 
 6
 We reversed these convictions on the grounds that the trial judge's hostility toward the defendants denied them due process and that wire tapes which were expressly excluded from admission into evidence were improperly given to the jury. United States v. Segines, 17 F.3d 847 (6th Cir.1994). As to the argument that there were four separate conspiracies rather than one, we stated that "[t]he law of this circuit permits the defendants to be retried on the conspiracy count as outlined in the original indictment. We emphasize, however, that the trial judge may decide at his discretion whether or not to issue a multiple conspiracies instruction to the jury." Id. at 857.
 
 
 7
 A federal grand jury then returned a superseding indictment charging essentially identical offenses except that the conspiracy was extended by 20 days, from an ending date of February 27, 1992 to an ending date of March 17, 1992, and Segines was charged with two additional counts of distribution dated March 12 and 13, 1992. A jury returned verdicts of guilty against Segines and Ayers on all counts and acquitted Alston of all charges. Segines was sentenced to a term of imprisonment of 262 months and 10 years of supervised release. Ayers was sentenced to a term of 360 months and 5 years of supervised release.
 
 B. Government Evidence at Trial
 
 8
 The evidence adduced at trial established that members of the Caribbean Gang Task Force in Cleveland were investigating Ayers and Alston during September, 1991. As part of the investigation, officers conducted controlled drug purchases from a residence owned by Adrian Ayers which was located on Carl Avenue in Cleveland.
 
 
 9
 During the period of September 30, 1991 through December 5, 1991, there were four separate controlled purchases of narcotics from occupants of the Carl Avenue residence through the use of a confidential informant. The first was made on December 5, 1991. Afterward, two individuals were observed leaving the Carl Avenue residence in a vehicle. Officers stopped the vehicle and seized $2,640 from the driver, Joseph Jackson, which included $200 of government money used by Smith in the controlled drug purchase. One of the officers involved in the investigation testified at trial, but the confidential informant who participated in the transactions did not.
 
 
 10
 The next day, members of the Caribbean Gang Task Force searched the Carl Avenue residence. Ayers and Alston were the only people in the house at that time. The officers observed Ayers throwing several objects on the floor, including bags of marijuana, a set of keys and two 9mm caliber rounds. The officers also observed Alston throwing a small scale on the floor.
 
 
 11
 The officers were directed by Ayers to two guns in a locked bedroom underneath a mattress. One of the firearms had been reported stolen by its owner that year. Ayers claimed to own the second firearm, an Intratec 9mm pistol. An analysis of the firearms revealed a fingerprint of the left ring finger of Ayers on the magazine of the 9mm pistol. The officers seized the firearms, a police scanner which was in the "on" position when the officers entered the residence and several documents in the name of Ayers, including a utility bill. During the search, Ayers asked one of the officers if his name was Parkinson and if he was "the guy that took the money off my boy" the day before.
 
 
 12
 In February 1992, another confidential informant named Robert Smith (Smith) met Ayers through Tamara Ayers who was Smith's girlfriend and Ayers's sister. On February 11, 1992, Smith arranged to make a controlled purchase of a half ounce of crack cocaine from Ayers at the A & A Gameroom (Gameroom), a video arcade owned by Ayers. Ayers told Smith that he did not have the crack cocaine there, but that he had to call "Mike." Ayers telephoned Alston and told him that he needed "a half." Shortly thereafter, Alston arrived at the Gameroom and gave Ayers a half ounce of crack cocaine. Ayers gave the crack cocaine to Smith for $530.
 
 
 13
 On February 13, 1992, Smith purchased another half ounce of crack cocaine from Ayers for $500 in the back room of the Gameroom. Segines produced "a big freezer bag" which Smith observed was "half full with rocks" of crack cocaine. After giving Smith one-half ounce, Ayers told Smith that if he was not available Smith could purchase the cocaine from Segines or Kyron Marlin (Marlin), Ayers's minor brother. That evening, officers observed Alston arrive at the Gameroom with a bag in his hand, leave and go to apartment 7 of an apartment building on Linn Drive in Cleveland (Linn Drive).
 
 
 14
 On February 18, 1992, Smith went to the Gameroom to make a controlled purchase of one ounce of crack cocaine. Upon arriving, Ayers informed Smith that he only had a quarter ounce of crack cocaine left and that Alston was out of town obtaining more drugs. Smith purchased the quarter ounce for $220.
 
 
 15
 On February 19, 1992, Smith went to the Gameroom to purchase one ounce of crack cocaine from Ayers for $1,000. Ayers told Smith that the police had just raided the Gameroom and that the transaction would have to be completed at his mother's house on Fifth Avenue in East Cleveland (Fifth Avenue). In the dining room of the residence on Fifth Avenue, Smith purchased one ounce of crack cocaine for $1,000 from Ayers.
 
 
 16
 Smith and Ayers arranged another drug purchase on February 21, 1992 for one ounce. Smith went to the Gameroom and, after meeting Ayers and Marlin, proceeded to the residence on Fifth Avenue. Once there, Ayers could not find the drugs. He had a discussion with Marlin concerning the location of the drugs. After being unable to locate an ounce, Ayers sold Smith a quarter ounce of crack cocaine for $220.
 
 
 17
 On February 24, 1992, officers searched the residence on Fifth Avenue. Among the items seized was 41.34 grams of crack cocaine found in the hollow part of a statute located in the living room.
 
 
 18
 On February 24, 1992, Smith purchased one-half ounce of crack cocaine from Marlin just outside of the Gameroom.
 
 
 19
 The next day the Gameroom was closed. Smith called Tammy Ayers and asked for "whoever was around." She contacted Marlin who sold a half ounce of crack cocaine to Smith in front of the Gameroom. During discussions about the price of the crack cocaine, Marlin asked Smith for money owed to Ayers by Smith for money that Tammy Ayers had borrowed from Ayers to purchase furniture.
 
 
 20
 On February 27, 1992, Smith purchased one-half ounce of crack cocaine from Segines at the Gameroom for $500. The sale was completed in the bathroom where Segines took the crack cocaine from rocks of crack cocaine he had in an aluminum foil packet.
 
 
 21
 On March 12, 1992, Smith negotiated a half ounce purchase with Segines over the telephone. Smith was instructed to go to the Linn Drive apartment. Marlin opened the door to the apartment and remained present while Segines conducted the transaction with Smith. Segines took the crack cocaine he sold to Smith from a "sack full of rocks" with about nine or ten "big, big crack cocaine rocks."
 
 
 22
 On March 13, 1992, Smith met with Segines at the Gameroom and from there went to the Linn Drive apartment. Smith purchased a quarter ounce of crack cocaine.
 
 
 23
 On March 17, 1992, officers arrested Ayers and Segines. Segines had $1617 inside one of his shoes. Ayers had a digital pager and $429. A search of the Linn Drive apartment produced a digital scale, a Cobra Mach 11 9mm handgun and a police scanner.
 
 C. Defense Evidence at Trial
 
 24
 At trial, Ayers presented testimony from four witnesses in his defense, primarily to establish an explanation of his source of income as a record producer to contradict the testimony of Smith, the government's main witness. Ayers's witnesses attempted to refute Smith's denial of the use of drugs and claimed that Smith was an active drug dealer. In addition, Ayers's defense purported to establish that Smith had duped the government by providing his own drugs during the controlled purchases and that Smith made it appear that the drugs came from Ayers.
 
 
 25
 The district court did not give a multiple conspiracies instruction.
 
 D. Sentencing
 
 26
 The district court conducted two sentencing hearings. The presentence report (PSR) calculated that the following amounts of crack cocaine were involved:
 
 
 27
 Carl Avenue residence 11.88 grams
 Gameroom 46.68 grams
 Fifth Avenue residence 62.48 grams
 Linn Drive 9.50 grams
 ------------
 Total 130.54 grams
 
 
 28
 The PSR concluded that the conspiracy involved in excess of 150 grams of crack cocaine. The additional 19.46 grams were drawn, without specificity, from information supplied by the government based on Smith's testimony:
 
 
 29
 1. Segines's big freezer bag of crack cocaine on February 13, 1996 at the Gameroom;
 
 
 30
 2. Ayers's indication on February 18, 1992 that he had sold most of the ounce of crack he had intended to sell to Smith and only had about one-quarter ounce left;
 
 
 31
 3. Ayers's inability to find the entire ounce he had intended to sell to Smith on February 21, 1992;
 
 
 32
 4. Segines's aluminum foil packet of crack cocaine on February 27, 1992 at the Gameroom;
 
 
 33
 5. Segines's sack full of rocks of crack cocaine on March 12 and 13, 1992.
 
 
 34
 The district court found that the total amount of crack cocaine possessed for distribution and actually distributed was in excess of 150 grams, agreeing with the addition of 19.46 grams to the 130.54 grams. In regard to Segines, the district court had to add more than this amount to arrive at 150 grams because Segines was in jail for a prior offense during the time of some of the transactions at the Carl Avenue residence. The district court stated in regard to Segines:
 
 
 35
 Although the 11.88 grams of crack and crack equivalent involving the Carl Avenue operation would not apply to him pursuant to guideline 1B1.3, application note number 2, the testimony reveals that he handled significant amounts of crack on two occasions when purchases of smaller amounts had been made at the [Gameroom]. Therefore, the total amount of crack would still fall between 150 and 500 grams ...
 
 
 36
 Segines had a resulting offense level of 35 and Ayers of 37. The district court sentenced Segines to a term of imprisonment of 262 months and 10 years of supervised release and Ayers to a term of 360 months and 5 years of supervised release.[2]
 
 II. Analysis
 A. Conspiracy
 
 37
 Both Segines and Ayers challenges their conviction of conspiracy to distribute cocaine on the basis of the weight of the evidence and the credibility of Smith. In addition, Segines argues that there were multiple conspiracies.
 
 
 38
 1. Sufficiency of the Evidence of Conspiracy
 
 
 39
 The standard of review for a claim of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989). To establish a drug conspiracy under 21 U.S.C. § 846:
 
 
 40
 'the government must prove that a conspiracy existed, that the accused knew of the conspiracy, and that he knowingly and voluntarily joined it.' United States v. Barrett, 933 F.2d 355, 359 (6th Cir.1991) (quoting United States v. Christian, 786 F.2d 203, 211 (6th Cir.1986)). The essence of conspiracy, of course, is agreement, but proof of a formal agreement is not necessary; 'a tacit or material understanding among the parties' will suffice. United States v. Pearce, 912 F.2d 159, 161 (6th Cir.1990), cert. denied, 498 U.S. 1093 (1991). 'A conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.' United States v. Blakeney, 942 F.2d 1001, 1010 (6th Cir.1991) (quoting United States v. Beavers, 787 F.2d 1022, 1026 (6th Cir.1985), cert. denied, 112 S.Ct. 646 (1991), and cert. denied, 112 S.Ct. 881 (1992). The government need not show that a defendant participated in all aspects of the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement. Further, the connection between the defendant and the conspiracy need only be slight.
 
 
 41
 United States v. Ledezma, 26 F.3d 636, 640 (6th Cir.1994).
 
 
 42
 Segines argues that Smith's testimony was not credible and that the evidence showed only that he was "an individual dealer of dope in an atmosphere of other entrepreneurs" and that his association with Ayers was that of a "friendly competitor." Similarly, Ayers contends that the evidence merely showed a "loose confederation of independent contractors who were known to take customers from each other." He points out that there is no evidence as to who got paid for the transactions, much less that the money was shared.
 
 
 43
 Smith's credibility is irrelevant. "[W]e stress that attacks on witness credibility are simply challenges to the quality of the government evidence and not to the sufficiency of the evidence. Such attacks make for effective closing arguments on behalf of a defendant, but are irrelevant with regard to the ... sufficiency standard ... Attorneys will do well to bear in mind the distinction between quality and sufficiency of evidence." United States v. Adamo, 742 F.2d 927, 935 (6th Cir.1984) (citations omitted), cert. denied, Freeman v. United States, 469 U.S. 1193 (1985).
 
 
 44
 Though Defendants' characterization of the relationship of the participants does not contradict the evidence, it also does not take the relationship outside of a conspiracy. There was sufficient evidence of a drug conspiracy involving Segines, Ayers, Alston and Marlin. Most if not all of the transactions about which Smith testified emanated from the Gameroom and involved some combination of the four individuals. Both Segines and Ayers retrieved crack cocaine on different occasions from under the bathroom sink in the Gameroom. During the February 13, 1992 transaction, Ayers negotiated and exchanged money while Segines produced and packaged the crack cocaine. Segines told Smith, and Ayers reiterated, that Smith could deal with Marlin or Segines if Ayers was not available. Both Segines and Marlin conducted transactions with Smith in Ayers's absence as well. Alston was seen arriving at the Gameroom with a bag and then proceeding to the Linn Drive apartment, the same location from which Segines sold crack cocaine to Smith with Marlin present.
 
 
 45
 A rational juror could find beyond a reasonable doubt that the participants did not take customers from each other, but filled in for each other to make sure someone was always available to make the transaction. The nature of the agreement comprising a conspiracy can be inferred from circumstantial evidence. United States v. Schultz, 855 F.2d 1217, 1221 (6th Cir.1988). The evidence showed that the participants worked as a team in conducting transactions, rather than as "friendly competitors" who referred away business that they on occasion could not accommodate. The participants conducted transactions together and operated out of the same place. There was sufficient evidence of a conspiracy and the nature of that conspiracy was taken into account as a sentencing factor.[3]
 
 
 46
 Segines further argues that there is insufficient evidence that he knew of the conspiracy or participated in it. "The existence of a connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great." United States v. Betancourt, 838 F.2d 168, 174 (6th Cir.1988). There was proof beyond a reasonable doubt of Segines' connection to the conspiracy. Direct evidence consisted of Segines' participation in the February 13, 1992 transaction with Ayers at the Gameroom and in the March 12, 1992 transaction with Marlin present at the Linn Drive apartment.
 
 
 47
 Ayers also argues that although he owned the Carl Avenue residence, he did not live there and there was no evidence that he conducted any transactions there. He argues that neither Segines nor Marlin was ever surveilled at the Carl Avenue residence and that the confidential informant who made the controlled buys there did not testify. Ayers denies any conspiratorial association with Jackson who was arrested after making a controlled buy.
 
 
 48
 A co-conspirator need not assent to all acts of a conspiracy nor participate in them, "so long as it is reasonable to infer that each crime was intended to further the enterprise's affairs." United States v. Hughes, 895 F.2d 1135, 1140 (6th Cir.1990). In making the comment to an officer searching the Carl Avenue residence that "You're Parkinson. You're the guy that took the money off my boy yesterday," Ayers may have been referring to "my friend" rather than "my employee" or "my business partner." However, his direct knowledge of the matter, together with his presence and ownership of the residence, is incriminating. Ayers was surveilled in the residence on several occasions and during controlled buys. He and Alston were in the residence when officers entered pursuant to a warrant and had keys to a locked bedroom in which he kept his gun. Also, officers found documents, including a utility bill, in Ayers's name. Alston's connection with Segines and Marlin was shown by the evidence.
 
 2. Multiple Conspiracies
 
 49
 A defendant can prevail on a claim of multiple conspiracies if he shows that the evidence presented could "reasonably be construed only as supporting a finding of multiple conspiracies rather than the conspiracy charged." United States v. Rugiero, 20 F.3d 1387, 1391 (6th Cir.), cert. denied, Rugiero v. U.S., 115 S.Ct. 208 (1994). "[A] single conspiracy is not converted into multiple conspiracies merely because there may be some changes in persons involved or because they play different roles." Id. A defendant must also show that he was prejudiced by the failure to instruct as to multiple conspiracies. "[I]n order to prove a single conspiracy, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal" and "[t]he fact that a conspiracy can be divided into distinct sub-groups does not mean that there is more than one conspiracy." United States v. Warner, 690 F.2d 545, 549 & 550 n. 8 (6th Cir.1982), citing, United States v. Martino, 664 F.2d 860, 876 (2d Cir.1981). Thus, "[a]s long as the different sub-groups are committing acts in furtherance of one overall plan, the jury can still find a single, continuing conspiracy." Id. at 550 n. 8.
 
 
 50
 Segines argues that he joined the conspiracy at a later date and therefore participated in a different conspiracy. However, the timing of participation is not dispositive:
 
 
 51
 The agreement may continue for a long period of time and may include the performance of many transactions. New parties may join the agreement at any time while others may terminate their relationship. The parties are not always identical, but this does not mean that there are separate conspiracies.
 
 
 52
 Id. at 549. The jury could have found from the evidence that in December 1992, Segines joined an already existing conspiracy and acted in furtherance of its overall plan to distribute crack cocaine in Cleveland.
 
 
 53
 Segines also argues that each transaction location constituted a separate conspiracy. However, the changing location of the transactions, if anything, shows the commitment of the members to their common plan. The evidence showed that the location of the transactions changed after each raid and the jury could have found that this was done in an effort to protect the overall plan to distribute crack cocaine. See United States v. Sanchez, 928 F.2d 1450, 1456 (6th Cir.1991) ("Although defendants argue that the separate cocaine transactions were separate conspiracies, 'a single conspiracy is not transposed into a multiple one simply by lapse of time, change of membership, or a shifting emphasis on his locale of operations' "), quoting United States v. Heinemann, 801 F.2d 86, 92 (2d Cir.1986).
 
 
 54
 Segines also has not shown prejudice. "If the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." United States v. Lee, 991 F.2d 343, 349 (6th Cir.1993), quoting United States v. L'Hoste, 609 F.2d 796, 801 (5th Cir.1980). Whether the conspiracy is divided by time or place, the evidence established Segines' involvement in a conspiracy.
 
 
 55
 In deciding the prior appeal, we left the decision of whether to instruct on multiple conspiracies to the district court's discretion. In view of the evidence, the district court did not err by choosing not to instruct the jury on multiple conspiracies.
 
 B. 21 U.S.C. § 861
 
 56
 Ayers argues that there was insufficient evidence of a 21 U.S.C. § 861 violation. Section 861 states in pertinent part:
 
 
 57
 It shall be unlawful for any person at least eighteen years of age to knowingly and intentionally--
 
 
 58
 (1) employ, hire, persuade, induce, entice, or coerce, a person under eighteen years of age to violate any provision of this subchapter or subchapter II of this chapter.
 
 
 59
 The standard of review for claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989).
 
 
 60
 Ayers concedes that he knew his brother dealt drugs, but argues that Marlin was an independent drug dealer over whom Ayers exerted no influence. Ayers points out that Marlin engaged in a transaction with Smith without Ayers present. Also, Ayers argues that he would not have had to question Marlin concerning the whereabouts of his drugs on February 21, 1992 if Marlin was under his control. Ayers relies on United States v. McDonald, 877 F.2d 91 (D.C.Cir.1989) (evidence insufficient where minor's ring found during search of crack house operated by defendant and minor seen running from the house with money in his pocket).
 
 
 61
 The evidence showed that Ayers used Marlin in the drug conspiracy. Ayers told Smith that he could buy from Marlin if Ayers was not around. This in fact occurred on February 25, 1992, when Smith could not get in contact with Ayers or Segines. During that transaction, Marlin asked Smith for money Ayers gave to Smith's girlfriend. Ayers's discussion with Marlin upon being unable to locate drugs and his demand that Marlin find the drugs, the jury could find beyond a reasonable doubt, was evidence of Marlin's subservience to Ayers in the drug operation.
 
 C.
 
 62
 Both Segines and Ayers argue that the district court erred in its calculation of the amount of drugs involved in the conspiracy and the amount attributable to each of them individually under the guidelines. A district court's findings of fact on the amount of cocaine attributable to a defendant are upheld unless clearly erroneous. United States v. Clemons, 999 F.2d 154 (6th Cir.1993), cert. denied, 114 S.Ct. 704 (1994). The findings must be supported by a preponderance of the evidence. United States v. Walton, 908 F.2d 1289, 1301 (6th Cir.), cert. denied, 489 U.S. 990 (1990).
 
 
 63
 Segines and Ayers were sentenced pursuant to United States Sentencing Guideline (USSG) § 2D1.2. SUBSECTION (2)[4], which adds one point to the offense level from USSG § 2D1.1, resulted in the greatest score for both Segines and Ayers. Relevant conduct is calculated according to USSG § 1B1.3 which takes into account, in the case of a jointly undertaken criminal activity, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." In determining the relevant conduct, Application Note 2 states:
 
 
 64
 Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity, jointly undertaken by the defendant ... is not necessarily the same for every participant. In order to determine the defendant's accountability for the conduct of others under subsection (a)(1)(B), the court must first determine the scope of the criminal activity the particular defendants agreed to undertake.
 
 
 65
 The presentence report concluded, and the district court found, that the relevant scope of conduct for both defendants was over 150 grams. This put them in the 150 to 500 gram range.
 
 1. Segines
 
 66
 Segines argues that the district court should not have attributed to him the amount of crack cocaine sold at the Fifth Street residence and, when he was not present, at the Gameroom. Under USSG § 1B1.3, whether Segines had knowledge of the Fifth Avenue sales and the sales at the Gameroom during which he was not present is irrelevant. The issue is whether the transactions, and the quantities involved, were foreseeable to Segines. United States v. Blankenship, 954 F.2d 1224, 1228 (6th Cir.), cert. denied, 506 U.S. 901 (1992). By Ayers's statement made in Segines' presence that Smith could deal with Segines or Marlin in Ayers's absence, Segines was made aware that Smith principally dealt with Ayers and that transactions of approximately one-half ounce of cocaine each would occur between the two in his absence.
 
 
 67
 Segines also argues that in arriving at a total of 150 grams, the district court speculated as to the 31.34 grams of crack cocaine it added to the known amount of 130.54 grams. The district court arrived at the additional 31.34 grams partly based on Smith's description of a "big freezer bag ... half full of rocks" he observed during the February 13, 1992 transaction. Smith described the freezer bag as being approximately 12 to 14 inches. Smith also testified that during the transaction at the Linn Drive apartment on March 12, 1992, he observed Segines with a "sack full of rocks" that was approximately 14 inches and contained "about nine or ten" "big, big crack cocaine rocks." Smith further testified that when Segines pulled one of the rocks out of the bag, he asked Segines what it was and Segines answered "half." Smith bought this half ounce. Two such rocks of crack cocaine, at the equivalent of one ounce, would weigh more than the 31.34 grams added by the district court. In light of this, the district court's decision was based on a rather conservative estimate. See Walton, supra at 1302 ("If the exact amount cannot be determined, an estimate will suffice [if supported by] a preponderance of the evidence").
 
 2. Ayers
 
 68
 Ayers makes the same arguments as Segines concerning the additional 31.34 grams, and further argues that the Linn Drive apartment and Carl Avenue residence transactions should not be attributed to him because he was not involved in the Carl Avenue transactions and that the firearm enhancement under USSG § 2D1.1 was not applicable to him because the firearms were found in the Carl Avenue residence and he was not involved in the transactions that occurred there.
 
 
 69
 The Linn Drive apartment transactions were foreseeable. Each involved a one-half gram purchase made by Segines, with whom Ayers told Smith to deal in Ayers's absence. As stated above, the Carl Avenue residence transactions and the firearms found there were reasonably foreseeable.
 
 III.
 
 70
 For the reasons stated, the convictions and sentences of Segines and Ayers are AFFIRMED.
 
 
 
 *
 Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [2]
 Both Segines and Ayers were given the lowest sentence within their guideline range
 
 
 [3]
 In deciding not to depart upward for Ayers's role in the offense, the district court stated:
 As an adjustment for role in the offense, the court has again read closely the record in this regard and finds that this offense involved people of relatively equal rank of friends, relatives, no formal chain of command and no formal organizational structure.
 
 
 [4]
 USSG § 2D1.2 states:
 Drug Offenses Occurring Near Protected Locations or Involving Underage ... Individuals; Attempt or Conspiracy
 (a) Base Offense Level (Apply the greatest):
 (1) 2 plus the offense level from § 2D1.1 applicable to the quantity of controlled substances directly involving a protected location or an underage ... individual; or
 (2) 1 plus the offense level from § 2D1.1 applicable to the total quantity of controlled substances involved in the offense; or
 (3) 26, if the offense involved a person less than eighteen years of age; or
 (4) 13, otherwise.