OPINION
Defendant-appellant Antonio DeLeon appeals from his conviction and sentence for Attempted Murder, Having a Weapon Under Disability, and the firearms specifications accompanying those charges. DeLeon argues that the trial court erred by, among other things, allowing the prosecutor to question him about a handgun that was found next to him on the seat of his car on the day of his arrest, despite the fact that prior to trial, the trial court had ruled that any evidence regarding the handgun would be excluded at trial absent some action by the defense that would "open the door" on that issue. The trial court permitted the questioning after finding that DeLeon had opened the door on the issue with his response to a previous question asked by the prosecutor. DeLeon asserts that irrespective of any "opening the door" on his part, the trial court should not have allowed the prosecutor to question him about the handgun, since its probative value, if any, was substantially outweighed by its prejudicial impact.
We conclude that the trial court erred when it found that DeLeon had opened the door to questioning about the handgun. DeLeon did not introduce any testimony about the handgun; to the contrary, it was the prosecutor who elicited testimony about the handgun while cross-examining DeLeon, who was duty-bound to answer the prosecutor's questions truthfully. Nevertheless, we conclude that defense counsel "invited" the trial court's error by conceding, erroneously, that the defense had opened the door to further questioning about the handgun. We also conclude that despite this, and other deficiencies in his counsel's performance, DeLeon was not provided with constitutionally ineffective assistance of counsel, because even if these errors had not occurred, there would still be no reasonable probability of a different result. Accordingly, the judgment of the trial court will be Affirmed.
 I
On November 9, 1997, Tanika Thompson and her three children were robbed at gunpoint in their home by intruders. One of Thompson's children is the daughter of Antonio DeLeon. DeLeon's friend, Dela Angela Mayho, observed that DeLeon was enraged when he learned about the robbery, and was determined to find the persons responsible. Several days later, DeLeon told Mayho that he had discovered the identity of the man who drove the robbers over to Thompson's house, and further mentioned to her that the man drove a truck.
In the weeks preceding the robbery, Mayho saw a black semi-automatic handgun with a laser sight in the bedroom closet of DeLeon's brother's apartment. Shortly after midnight on November 14, 1997, Mayho received a call from DeLeon, who was "ranting and raving" because he could not find his handgun at his brother's apartment.
Later that same morning, around 7:00 a.m., Travis Eskew was driving to work in his purple pickup truck. While stopped at the stop sign at the corner of Fairview and Emerson Avenues, Eskew waited for a child to cross the street. Suddenly, the rear window of Eskew's truck "exploded." Believing that someone was either firing a shot or throwing rocks at him, Eskew took off through the intersection. The next thing Eskew remembered was waking up on the ground, being very cold and surrounded by firemen and paramedics. Confused, Eskew assumed that he had been in a car accident, but on the ambulance ride to the hospital, Eskew observed the firemen around him "hi-fiving" one another, saying, "we got an entry hole," and "he's alive."
Two persons witnessed the shooting: Anthony Brown, a bus driver for RTA, who was driving his route, and Tashia Benson, a twelve-year old, who had been waiting for her school bus on the corner of Fairview and Emerson Avenues, and who had walked in front of Eskew's truck moments before he was shot. Brown and Benson gave police a roughly similar description of the shooter, to wit: that he was a light-skinned black man, who wore white shoes and "hospital" or "doctor's" pants.
Later that day, DeLeon came over to Mayho's apartment, and they watched the news together. When a story came on about a shooting involving a man in a truck, DeLeon told Mayho, "that was the guy that was responsible for the incident at [his daughter's] house; and that he had shot him." Mayho did not question DeLeon about the event, and did not intend to tell anyone about DeLeon's admission because she was afraid.
However, on February 14, 1998, Mayho and DeLeon became involved in an argument over her turning off the kitchen light. DeLeon slammed Mayho against the kitchen door twice. At one point, he picked up a steak knife and told Mayho, "B[itch], I'm going to kill you." Frightened, Mayho left her apartment. After the incident, Mayho returned to her apartment after work one day to find that DeLeon had removed all of his personal belongings. Fearing that DeLeon's purpose in doing so was to remove any evidence that he had stayed there, so that the police would not be able to trace back to him any crime he was about to commit against her, Mayho went to the Kettering Police and told them about the threat DeLeon had made to her. Fearing that the police were not taking her concerns seriously, Mayho told them about DeLeon's admission that he had shot a man in a pick-up truck on November 14, 1997.
The Kettering Police Department relayed the information given to them by Mayho to the Dayton Police Department. The Dayton police created a photo spread containing DeLeon's photograph and showed it to Benson, who picked out DeLeon's photograph as the one who did the shooting. DeLeon was arrested on March 6, 1998. The following day, Brown picked DeLeon out of a police line-up. Afterwards, Benson was shown a videotape of the line-up, and she again picked DeLeon.
On March 12, 1998, the Montgomery County Grand Jury issued an eight-count indictment against DeLeon, charging him with Attempted Murder, three counts of Having a Weapon Under Disability, Unlawful Possession of a Dangerous Ordnance, Possession of Powder Cocaine, Possessing Criminal Tools, and Possession of Crack Cocaine. Several of the counts were accompanied by a firearm specification. The first two counts of the indictment, Attempted Murder with a firearm specification and Having a Weapon Under Disability, arose from the events of November 14, 1997. The remaining charges arose from the circumstances surrounding DeLeon's arrest on March 5, 1998.
DeLeon filed motions to suppress certain evidence seized by police and to sever the first two counts of the indictment from the remaining counts. On May 8, 1998, a hearing was held on DeLeon's motion to suppress. At the hearing, the State presented Brown and Benson as witnesses. Brown again identified DeLeon as the shooter. However, Benson was unable to identify DeLeon on six separate occasions. Indeed, Benson stated on two occasions that she was "sure" and "certain" that DeLeon was not the shooter.
On October 14, 1998, the trial court granted DeLeon's motion to sever the first two counts of the indictment from the remaining counts for purposes of trial. On October 27, 1998, a "Re-indictment" was issued, adding a ninth count, Possession of a Dangerous Ordnance, with a firearm specification, and adding additional firearm specifications to some of the first eight counts. The original indictment was nolled on November 2, 1998.
DeLeon was tried on counts three through nine in November, 1998. He was convicted of Possession of a Dangerous Ordnance, Having a Weapon Under Disability, and Possession of Cocaine, along with the firearm specifications accompanying those charges, and sentenced to a term of imprisonment of sixteen years, plus an additional six years on the firearm specification which had been merged for purposes of sentencing. DeLeon's conviction and sentence on those charges were affirmed on appeal by this court in State v. DeLeon (May 19, 2000), Montgomery App. No. 17574, unreported.
Immediately prior to the start of the trial on the first two counts of the indictment, the trial court granted a motion in limine raised by DeLeon and ruled that no evidence regarding any firearms or other contraband seized from DeLeon at the time of his arrest would be admitted into evidence, "unless [the defense] open[ed] the door by some reference that would bring that back as an issue."
From November 15, 1999 to November 22, 1999, DeLeon was tried on the charges of Attempted Murder with a firearm specification and Having a Weapon Under Disability. The prosecution presented as witnesses Mayho, Benson, and Brown, among others, who testified to the facts related above. The prosecution also presented the testimony of a ballistics expert who testified that an examination of the 13 shell casings found by police at the scene enabled him to conclude that the shooter used a nine-millimeter semiautomatic handgun to shoot Eskew. Detective Doyle Burke testified that the weapon used to shoot Eskew was never found.
The defense presented the testimony of several witnesses, including DeLeon and his fiancee, Jeaneane Sullivan. Sullivan testified that DeLeon was with her at the time of the shooting. However, Sullivan's testimony was undercut by Tanika Thompson's testimony that DeLeon called her after he had been arrested and told her that Sullivan would testify that she was with the person who shot Eskew and that person was not DeLeon.
During her cross-examination of DeLeon, the prosecutor asked him if he ever had a gun in his possession while he was on parole. Defense counsel's objection to the question was overruled, and DeLeon answered that "[t]here was a gun on the seat of the car on the day I was arrested." The prosecutor subsequently asked DeLeon if a nine-millimeter semiautomatic was on the seat next to him on the day he was arrested. Defense counsel objected to this question, and the trial court overruled it on the grounds that DeLeon had "opened the door" to the question by stating that there was a gun on the seat of the car at the time of his arrest. DeLeon subsequently acknowledged that the gun was next to him at the time of his arrest.
The jury convicted DeLeon of Attempted Murder and Having a Weapon Under Disability, as well as the accompanying firearm specifications. DeLeon was sentenced to ten years for Attempted Murder, five years for Having a Weapon Under Disability, and three years for the firearm specifications, with all sentences to be served consecutively to each other, and consecutively to the sentences previously imposed for his other convictions under the same indictment.
DeLeon appeals from his conviction and sentence.
 II
DeLeon's First and Third Assignments of Error state as follows:
 PROSECUTORIAL MISCONDUCT DEPRIVED THE DEFENDANT OF A FAIR TRIAL AND DUE PROCESS OF LAW IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION. THE TRIAL COURT ERRONEOUSLY OVERRULED DEFENSE COUNSEL'S INITIAL OBJECTION TO PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT THEREBY DEPRIVING THE DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.
DeLeon alleges that the prosecutor engaged in several instances of misconduct that, taken together, deprived him of a fair trial. DeLeon further alleges that the trial court erred by overruling defense counsel's objection to the prosecutor's characterizing his closing argument as one asserting the existence of a conspiracy between the police, prosecutors, and witnesses to unfairly convict the defendant. We find both of these arguments unpersuasive.
The test for prosecutorial conduct is whether the prosecutor's remarks or actions were improper, and, if so, whether they prejudiced the defendant's substantial rights, thereby depriving him of a fair trial. State v. Lott (1990), 51 Ohio St.3d 160, 165, and State v. Apanovitch (1987), 33 Ohio St.3d 19, 24.
First, DeLeon contends that the prosecutor engaged in misconduct by asking questions of himself and his alibi witness Jeaneane Sullivan, implying that they had recently fabricated their testimony to establish an alibi for him, when, in fact, the record demonstrates that he had filed a notice of alibi shortly after his arrest, indicating he was with Sullivan at the time of the shooting.
Prosecutors have wide latitude in cross-examining witnesses, subject to the trial court's discretion. State v. Garfield (1986),34 Ohio App.3d 300, 303. DeLeon did not object to the prosecutor's questioning at trial; therefore, DeLeon has waived all but plain error. State v. Ballew (1996), 76 Ohio St.3d 244, 254. However, we discern no error, plain or otherwise, with respect to this aspect of the prosecutor's cross-examination of DeLeon and Sullivan.
For example, one of the questions DeLeon cites as evidence of prosecutorial misconduct involved the prosecutor asking him, "[a]nd no one before this day, other than your attorney, represented to this court system, ever heard that story [regarding his alibi]?" A careful reading of the question shows that the prosecutor is implicitly acknowledging that DeLeon's attorney did inform the court system about his alibi. Furthermore, it was not improper for the prosecutor, during Sullivan's cross-examination, to bring out the fact that she never told anyone investigating the case — the police or prosecutors, for example — that DeLeon was with her at the time of the shooting. This information was relevant in determining the truthfulness of Sullivan's testimony, particularly in light of the evidence presented that DeLeon's alibi had evolved from having Sullivan testify that she was with the real shooter, who was not DeLeon, at the time of the incident, to having Sullivan testify that DeLeon was with her in her apartment at the time of the shooting. Additionally, while DeLeon may have listed Sullivan as an alibi witness shortly after his arrest, that does not prove that she had agreed at that time to provide alibi testimony for him.
Second, DeLeon argues that the prosecutor engaged in misconduct when she characterized defense counsel's closing remarks as an argument that the police, prosecutors, and witnesses were engaged in a conspiracy to convict him. DeLeon also argues that the trial court erred when it overruled his defense counsel's objection that the prosecutor was mischaracterizing his argument.
Prosecutors are entitled to wide latitude in closing arguments in commenting on what the evidence has shown and what reasonable inferences the jury may draw from it. Ballew, supra, at 255. The latitude afforded a prosecutor during closing arguments falls within the trial court's sound discretion, State v. Loza (1994), 71 Ohio St.3d 61, 78, and the trial court's exercise of that discretion will not be reversed absent an abuse thereof.
Here, the prosecutor's characterization of defense counsel's argument amounted to fair comment, and the trial court did not abuse its discretion by allowing it over defense counsel's objection. Initially, during cross-examination, DeLeon told the prosecutor that she was a "persecutor not a prosecutor." During his closing remarks, DeLeon's counsel tried to explain Sullivan's failure to tell police prior to trial about DeLeon's alibi by telling the jury that the police "had already decided * * * who they believed was the perpetrator[,]" and that "nobody was going to come in and say different to them at that point." On numerous occasions defense counsel accused Mayho of lying to the jury, particularly with regard to her testimony that DeLeon had admitted to her that he had shot Eskew. Defense counsel suggested that one of her motives for doing so was her anger at the fact that DeLeon had deceived her about the real nature of his relationship with Sullivan. Given these remarks by the defendant and his counsel, it did not constitute misconduct for the prosecutor to characterize defense counsel's argument as alleging that a conspiracy existed between the police, the prosecution, and the State's witnesses, and then to dismiss that same argument as nonsense.
DeLeon also alleges that the prosecutor engaged in misconduct when she expressed her personal opinion or belief on at least three occasions. Two of the occasions involved the prosecutor's assertion that Sullivan was lying when she provided an alibi for DeLeon. The third involved the prosecutor's attempt to minimize the inconsistent testimony of the State's witnesses concerning the issue of whether the shooter had a beard, by stating, "[w]hen I look at the defendant, I don't see a beard. I see those eyes. And I'm sure you do too." We find that none of these three instances constituted prosecutorial misconduct.
While a prosecutor cannot express his personal opinion or belief that a witness lied, he may argue that the evidence presented demonstrates that a witness was lying. State v. Gunn (Aug. 7, 1998), Montgomery App. No. 16617, unreported. Here, the prosecutor supported her statements regarding Sullivan's veracity by referring to the evidence that Sullivan had not told anyone investigating the case about the alibi prior to trial, and that, originally, Sullivan was going to testify that she was with the real shooter (who was not DeLeon) at the time of the incident.
Additionally, because a defendant's face and body are physical evidence, it is permissible for a prosecutor to comment on a defendant's physical appearance. State v. Lawson (1992), 64 Ohio St.3d 336, 347. Therefore, it was appropriate for the prosecutor to comment on DeLeon's eyes.
DeLeon also alleges that the prosecutor engaged in misconduct when she "invited jurors to go outside the evidence" and "[i]magine the pressure" on Benson after she discovered that her uncle was related to the defendant. DeLeon asserts that "absolutely no evidence of pressure was presented." We disagree. Although Detective Burke testified that upon talking to Benson after the suppression hearing, he was confident that she had not been threatened to change her testimony, it was nevertheless appropriate for the prosecutor to ask the jury to consider whether her uncle's relationship to the defendant may have created any pressures, self-imposed or otherwise, on Benson to alter her testimony, at least temporarily, regarding the identity of the shooter.
In light of the foregoing, DeLeon's First and Third Assignments of Error are overruled.
 III
Leon's Second Assignment of Error states:
 DEFENDANT WAS DEPRIVED OF THE EFFECTIVE SISTANCE OF COUNSEL IN VIOLATION OF THE SIXTH AND URTEENTH AMENDMENTS TO THE U.S. CONSTITUTION.
In order to prevail on an ineffective assistance of counsel claim, a criminal defendant must show that his attorney's performance fell below an objective standard of reasonable representation, and that he was prejudiced thereby. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. In order to show that he "has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id., paragraph three of the syllabus.
First, DeLeon asserts that his defense counsel erred by not objecting to "numerous instances of severe prosecutorial misconduct." However, for the reasons stated in Part II of our opinion, we find that no prosecutorial misconduct occurred.
Second, DeLeon argues that his defense counsel erred by failing to inform the jury that Benson had not only failed to identify him as the shooter on six occasions during the motion to suppress hearing, but had said that she was "certain" and "sure" that DeLeon was not the shooter.
DeLeon had different counsel represent him at the motion to suppress hearing and at trial. Nevertheless, we agree that defense counsel should have familiarized himself with Benson's testimony at the suppression hearing, and should have pointed out to the jury that Benson was not only unable to identify DeLeon on six occasions at the suppression hearing, but, in fact, had stated that she was "certain" and "sure" that DeLeon was not the shooter. However, we conclude that even if this error had not occurred, there is still no reasonable probability of a different outcome. There was evidence that Benson was under pressure not to identify DeLeon as the shooter at the time of the suppression hearing, since he was related to her uncle. Furthermore, the State had a second eyewitness, Brown, who identified DeLeon as the shooter. Also, the State did not rely on eyewitness testimony alone to convict DeLeon. Mayho testified that DeLeon had admitted to her that he shot Eskew. Additionally, there was evidence that DeLeon had attempted to have his girlfriend Sullivan fabricate an alibi for him by testifying that she was with the real shooter (who was not DeLeon) at the time of the incident.
Third, DeLeon argues that his counsel was ineffective for not hiring the services of an expert witness on the issue of eyewitness identification. However, as DeLeon himself acknowledges, this court has already held that a claim of ineffective assistance of counsel that is based upon the failure of counsel to call an expert witness cannot properly be the subject of a direct appeal if it relies, for its determination, upon evidence that is outside the record, i.e., that there is favorable testimony that an expert would have been prepared to give, had he been called. State v. Chinn (Aug. 21, 1998), Montgomery App. No. 16764, unreported.
Nevertheless, DeLeon requests that we rule upon his claim based upon the current record because expert testimony on this issue was "so obviously necessary" in this case, and a local, well-respected expert was available to provide that testimony. We decline to do so.
Even if counsel's performance was deficient in failing to hire an expert on eyewitness testimony, there still would be no reasonable probability of a different outcome given the fact that the State's case against DeLeon did not rest upon eyewitness testimony alone, but included, among other things, Mayho's testimony that DeLeon had admitted shooting Eskew.
Accordingly, DeLeon's Second Assignment of Error is overruled.
 IV
DeLeon's Fourth Assignment of Error states:
 THE TRIAL COURT ERRONEOUSLY OVERRULED DEFENSE COUNSEL'S OBJECTION TO THE STATE'S DESCRIPTION OF THE GUN FOUND ON THE DEFENDANT'S CAR SEAT ON THE DATE OF HIS ARREST, THEREBY DEPRIVING THE DEFENDANT OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL IN VIOLATION OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION.
Immediately prior to trial, defense counsel raised a motion in limine requesting that any testimony concerning any firearms or other contraband seized from DeLeon's person, vehicle, or residence on the day of his arrest be excluded from evidence on the ground that its probative value, if any, would be substantially outweighed by the prejudicial impact of the evidence. The prosecutor agreed with defense counsel's argument, and stated that she had no intention of mentioning in her case in chief any of the circumstances surrounding DeLeon's March 5, 1998 arrest. However, the prosecutor added that if DeLeon "takes the stand and opens the door to certain issues, then * * * this issue will have to be addressed at that time." The trial court granted the motion subject to the defense "open[ing] the door by some reference that would bring that back as an issue."
During cross-examination, the prosecutor asked DeLeon, "[d]id you ever have a gun in your possession while you are on parole?" Defense counsel objected to the question on relevancy grounds, and the trial court overruled it. DeLeon then answered, "[t]here was a gun on the seat of the car on the day I was arrested." Shortly thereafter, the prosecutor asked DeLeon, "[a]nd when you were arrested, next to you on the front seat was that nine millimeter semiautomatic with the extended magazine; was it not?" Defense counsel objected to the prosecutor's describing the gun, arguing that it was irrelevant and prejudicial. The trial court called for the parties to approach for a sidebar conference and the following exchange took place:
 MR. ROHRKASTE [Defense counsel]: I don't have a problem with the gun but the description of the type of gun, the extended magazine. That's all highly prejudicial. That is, like, just to inflame the jury. Is it not enough to say it is a gun. [Sic.] Does he have to be tried by this case [sic]?
 THE COURT: Who brought up the gun on the seat next to him? Am I missing something here? When you mentioned it —
 MR. ROHRKASTE: I brought it up, but does that allow her to give a gory description of it?
 THE COURT: I instructed the prosecutor that she cannot bring it up unless the door was opened. Him having said he was there with the gun next to him, she can ask what the gun was. He admits or denies it.
 And then we move on. We don't want to go into anything further.
 She did not bring it up first. She followed my instructions. The door is open to a gun next to him. I think that what the gun is, can be asked. This is cross examination.
 But for his statement, you're absolutely right, there's no way in hell that description would come in. But he is the one who said it.
She can follow up with what it was and that is it.
The prosecutor then asked DeLeon, "[d]o you deny that that gun was next to you on the seat on the day you were arrested[,]" and DeLeon replied, "[n]o, ma'am."
DeLeon argues that "regardless of any `opening of the door,' permitting the gun to be described substantially prejudiced [his] case," and, therefore, requires reversal.
Despite the fact that DeLeon has implicitly acknowledged, or at the very least, assumed arguendo, that he opened the door to the prosecutor's questioning about the handgun found next to him at the time of his arrest, we find that DeLeon did not, in fact, open the door on this issue as the trial court found.
Under the "opening the door" doctrine, where a party has elicited or introduced prejudicial or inadmissible testimony, his opponent, in the trial court's discretion, may introduce evidence on the same issue in order to rebut any false impression that may have resulted from the earlier admission. United States v. Segines (C.A.6, 1994), 17 F.3d 847,856.
Here, DeLeon did not introduce or elicit testimony about the handgun that was found next to him on the seat of his car on the day of his arrest; to the contrary, it was the prosecutor who elicited that information from him when she asked him if he ever had a weapon while he was on parole. When his objection to that question was overruled, DeLeon was duty-bound to answer that question truthfully. DeLeon's answer to the prosecutor's question about whether he possessed a handgun while on parole did not open the door to the prosecutor's subsequent question, which included a description of the handgun. In fact, the prosecutor breached the trial court's ruling on DeLeon's pre-trial motion in limine by asking DeLeon if he ever had a weapon while he was on parole, without limiting the question to the time of the shooting. The prosecutor could have asked DeLeon if he ever possessed a weapon while he was on parole up until the date of the shooting. By not limiting the scope of her question, the prosecutor forced DeLeon to discuss the weapon found near him at the time of his March 5, 1998 arrest.
The above analysis notwithstanding, a close examination of the transcript of the sidebar conference reveals that DeLeon's counsel waived any objection to the prosecutor's asking DeLeon about the gun found on the seat next to him at the time of his arrest, per se, by indicating at the beginning of the sidebar conference that he had "no problem" with questions about the gun, but only with the prosecutor's "gory" description of it. Furthermore, when the trial court asked defense counsel, "[w]ho brought up the gun on the seat next to him[,]" and defense counsel responded, "I brought it up * * *[,]" defense counsel invited the trial court's error in finding that the defense had opened the door to further questioning about the gun. Pursuant to the "invited error" doctrine, a party cannot "take advantage of an error which he himself invited or induced." State v. Campbell (2000), 90 Ohio St.3d 320,324, quoting Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co. (1986),28 Ohio St.3d 20, paragraph one of the syllabus. The remaining question before us, then, is whether defense counsel's actions amounted to constitutionally ineffective assistance of counsel.
Prior to trial, the trial court granted defense counsel's motion in limine which requested, among other things, that any testimony concerning any firearms seized from DeLeon on the day of his arrest be excluded from evidence. When the prosecutor asked DeLeon if he ever had a gun in his possession while he has been on parole, defense counsel raised an objection on relevancy grounds, which was properly overruled. Defense counsel should have asked that the scope of the prosecutor's question be limited to the date of the shooting. By not doing so, DeLeon was forced to discuss the gun found next to him at the time of his arrest. Furthermore, when the trial court asked defense counsel, "[w]ho brought up the gun on the seat next to him," defense counsel should not have answered, "I brought it up," because, it led the trial court to conclude, erroneously, that the defense had opened the door to further questioning about the gun. This, in turn, led to the trial court's error in allowing the prosecutor to ask DeLeon, "[d]o you deny that that gun [i.e., the nine millimeter semiautomatic with the extended magazine] was next to you on the seat on the day you were arrested * * *?" When DeLeon answered, "[n]o, ma'am[,]" the effect of this testimony, from the juror's viewpoint, may well have been to place the weapon used to shoot Eskew, which, according to the State's ballistic expert, was a nine millimeter semiautomatic, in DeLeon's hands.
Given the foregoing, we conclude that defense counsel's performance, which allowed for this testimony to be admitted, fell below an objective standard of reasonable representation. Bradley, supra, paragraph two of the syllabus. However, even when this deficient performance by defense counsel is combined with defense counsel's failures to: (1) inform the jurors that Benson stated on two occasions that she was "sure" and "certain" DeLeon was not the shooter, and (2) hire an expert witness on eyewitness identification, we are still not convinced that, but for counsel's errors, there exists a "reasonable probability" that the outcome of the trial would have been different. Id., paragraph three of the syllabus.
Because the "prejudice" prong of the standard for determining whether defense counsel provided his client with constitutionally ineffective assistance of counsel is couched in terms of a "reasonable probability," the standard is a difficult one to meet. As noted earlier, there were two eyewitnesses (Benson and Brown) who identified DeLeon as the shooter; there was another witness (Mayho) who testified that DeLeon had admitted to her that he had shot Eskew in retaliation for the robbery that occurred at his daughter's home; and there was evidence that DeLeon had attempted to fabricate an alibi by having his girlfriend Sullivan state that she was with the real shooter, who was not DeLeon, at the time of the incident.
Admittedly, this testimony was not problem-free; at a suppression hearing, Benson temporarily retracted her testimony identifying DeLeon as the shooter, and Mayho had a motive for lying about DeLeon's admission. Nevertheless, there was evidence that Benson had pressures on her not to identify DeLeon as the shooter, since her uncle was related to him. Furthermore, the eyewitness testimony of Brown and Benson corroborated Mayho's testimony regarding DeLeon's confession, and vice-versa. Although the question is close one, after viewing the evidence in its totality, we cannot say that there is a reasonable probability of a different outcome had it not been for counsel's errors.
Accordingly, DeLeon's Fourth Assignment of Error is overruled.
 V
DeLeon's Fifth Assignment of Error states:
 MR. DELEON'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
In reviewing a claim that a conviction was against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences that can be drawn from it, consider the credibility of witnesses, and then determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Martin (1983),20 Ohio App.3d 172, 175. However, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id.
DeLeon cites two factors which, he asserts, requires reversal on manifest weight of the evidence grounds. The first involves the fact that both Benson and Brown initially told police that the shooter was clean shaven, while, according to DeLeon, the "overwhelming" amount of evidence presented at trial showed that DeLeon had a "full beard" on the day of the shooting. However, in her subsequent statements, Benson indicated that the shooter did have "a little bit of mustache," and "hair coming around the chin and kind of connecting like that." Brown acknowledged in his testimony that he had initially described the shooter as clean shaven, but that he could not tell if DeLeon had facial hair on the day of the shooting. At trial, Mayho described DeLeon's beard as being an "outline." None of the inconsistent testimony about whether the shooter had a beard made the jury's verdict against the manifest weight of the evidence. Beards can be shaven, trimmed, or allowed to grow. Furthermore, the jury was in the best position to see DeLeon's so-called "full beard," and determine whether the testimony of any eyewitness who initially described the shooter as clean-shaven, but who later identified DeLeon as the shooter, was, nonetheless, credible.
The second factor cited by DeLeon in support of his manifest weight of the evidence argument is what he refers to as the "inherently incredible" testimony of Dela Angela Mayho. Mayho testified that DeLeon admitted to her that he had shot Eskew, a white male, because he believed that Eskew was the man who drove the getaway car in the robbery of Tanika Thomas' house. DeLeon asserts that Mayho's testimony is unbelievable in light of Thomas' testimony that the robbers were black; no whites were involved; she never mentioned a getaway car to anyone; and, in fact, her own car was stolen in the robbery. However, Thomas' testimony did not make Mayho's testimony unworthy of belief. Thomas was bound with duct tape at the time of the robbery; therefore, she was not in a position to discern if a getaway car was used, let alone the person driving it. Furthermore, this portion of DeLeon's argument assumes that DeLeon would have acted rationally in shooting the person whom he believed had robbed his daughter's house. The jury was not required to accept that assumption in arriving at its decision.
In light of the foregoing, DeLeon's Fifth Assignment of Error is overruled.
 VI
All of DeLeon's assignments of error having been overruled, the judgment of the trial court is Affirmed.
 ________ FAIN, J.