**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0679n.06

**No. 08-6445**

**FILED**
**Nov 04, 2010**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

UNITED STATES OF AMERICA,

    **Plaintiff-Appellee,**

v.

THEODORE A. HOGAN,

    **Defendant-Appellant.**

                          /

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE**

**BEFORE:**    MARTIN, COLE, and CLAY, Circuit Judges.

    **CLAY, Circuit Judge.** Defendant Theodore Arthur Hogan appeals from a judgment entered on December 3, 2008, sentencing Defendant to a 262 month term of imprisonment and assessing Defendant a criminal penalty of $400.00 for three counts of distributing heroin and one count of possessing dihydrocodeine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B). For the reasons stated below, we **AFFIRM** the district court's decision.

## I. BACKGROUND

### A.    Factual Background

    In November 2004 First Judicial District Drug Task Force agents Chris Pierce and Eric Borchgrevink outfitted confidential informant Roger Greenwell with money and a listening device

and sent him to a residence in Carter County, Tennessee to purchase drugs from Kim Probst. Probst was not home when Greenwell arrived at her house, but as Greenwell left Probst's property Defendant approached him and offered to sell him two bags of heroin. Providing Greenwell with his phone number, Defendant added that in the future he could sell Greenwell a bundle of heroin for $300. Greenwell returned to the agents, who searched Greenwell and took the heroin Greenwell had just purchased from Defendant. (1 Tr. of Record at 28-30, 34-35.)

Agents arranged two additional transactions between Defendant and Greenwell. Before each transaction, agents searched Greenwell, outfitted him with a listening device, and provided him with recorded currency. After each transaction, agents searched Greenwell, and recovered the heroin.

During the November 5, 2004 transaction the agents surveilling the buy observed a blue Ford Taurus registered to Defendant pull up alongside Greenwell's vehicle. The agents watched and listened as Defendant sold Greenwell a bundle of heroin. After the transaction's completion, the agents pulled into the gas station to get a closer look at Defendant. Agent Pierce made mental note of Defendant's appearance and the fact that he was wearing a blue Adidas jacket. (*Id.* at 39-43, 46-50.)

The final transaction on November 10, 2004 was at Greenwell's apartment. The primary purpose of this transaction was to arrest Defendant while he possessed the recorded currency. The transaction's secondary purpose was to arrest Greenwell for Greenwell's unrelated criminal activity based on information provided to agents from another informant, known as "Slim." (Br. of Appellee at 6.)

The agents observed Defendant's blue Ford Taurus parked at Greenwell's apartment complex. They also observed Greenwell and Defendant enter the complex. Agent Pierce arrested Defendant as he was leaving Greenwell's apartment upon the transaction's completion. Agents searched Defendant's pockets incident to his arrest, and found eight bags of heroin, fourteen Lortab tablets, and $300 bearing the same serial numbers logged by the agents. Agents' subsequent search of Defendant's car revealed a large knife, several sandwich baggies fastened with a rubber band, three additional baggies containing heroin residue, and a blue Adidas jacket. (1 Tr. of Record at 58-63.)

Once Defendant was in custody, Agent Borchgrevink entered Greenwell's apartment and recovered the heroin Greenwell purchased from Defendant, removed the listening device from Greenwell's person, and arrested Greenwell on the unrelated charges. (*Id*. at 64.)

**B.    Procedural History**

Defendant was indicted by a federal grand jury for three counts of distributing heroin and one count of possessing dihydrocodeine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B). Defendant pleaded not guilty and the case proceeded to trial.

On the first day of trial, during Agent Pierce's testimony, the government learned that Agent Borchgrevink, not Agent Pierce, recovered the heroin that Greenwell purchased from Defendant in the final November 10, 2004 transaction. (1 Tr. of Record at 64, 2 Tr. of Record at 127.) As a result, the government decided to have Agent Borchgrevink testify.

At the end of the first day, the government disclosed to Defendant a form Agent Borchgrevink had filled out containing possible impeachment material. Agent Borchgrevink generated this form when he received information from "Slim" regarding Greenwell's criminal activity. The form was

filed under the same investigation number used to reflect agents' payments to Greenwell to purchase drugs from Defendant. (Br. of Appellee at 9-10.)

Defense counsel objected to the delayed disclosure. In response to defense counsel's concerns over the delayed disclosure, the district court offered the defense an unrequested continuance to consider the new evidence. The district court also suggested several witnesses that the defense could question regarding the identity of the confidential informant and processing of the disclosed paperwork. Shortly thereafter the district court adjourned trial to permit defense counsel to consider how best to respond.

The following day, outside of the jury's presence, defense counsel accused the prosecutor of misconduct. However, the defense counsel failed to articulate a clear basis for the assertions. Although it saw no violations, the court permitted the defense to cross-examine the officers or call other witnesses. The defense did not accept the district court's suggestions. (3 Tr. of Record at 209-12.) The district court then resumed the trial.

Over objection, the government introduced into evidence two composite tapes containing excerpts of the recorded transactions between Greenwell and Defendant. (1 Tr. of Record at 31, 42-43.) Each recording was a short excerpt from the original thirty minute tapes. The district court admitted the tapes although it found in an *in camera* hearing that no foundation was laid for Agent Pierce's identification of the voices on the tapes. (3 Tr. of Record at 212.) Indeed, one of the recordings was made before Officer Pierce had even heard Defendant's voice. (1 Tr. of Record at 31.)

The government selected portions of the tapes to play for the jury, and sought to furnish the jury with a transcript of the excerpts as an aid. To that end the government prepared transcripts of

the recordings, which a magistrate judge evaluated in supplemental hearings outside of the jury's presence. The magistrate judge compared the transcripts with the composite recordings and ordered the preparation of new transcripts, which he approved for trial use. The composite tapes were thus admitted as evidence and the court furnished the jurors with transcripts, admonishing the jury that the transcripts were not evidence.

The jury deliberated, convicted Defendant on all counts, and the district court subsequently sentenced Defendant to 262 months in prison. This timely appeal ensued.

## II. DISCUSSION

### A. *Brady v. Maryland* Violations

#### 1. Standard of Review

This Circuit applies two standards in reviewing determinations regarding alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963). The Court "reviews denial of a motion for a new trial based on *Brady* violations under an abuse of discretion standard. However, the district court's determination as to the existence of a *Brady* violation is reviewed de novo." *United States v. Graham*, 484 F.3d 413, 416-17 (6th Cir. 2007) (internal citations omitted.); s*ee also United States v. Heriot*, 496 F.3d 601, 605 (6th Cir. 2007).

#### 2. Analysis

In this case Defendant claims that the delay in the prosecution's disclosure of a form completed by prosecution witness Agent Borchgrevink, containing possible impeachment material at the end of the first day of trial, constituted a *Brady* violation. According to the government the form was generated when Agent Borchgrevink paid "Slim" for information.

Defendant contends that the government improperly delayed disclosure of information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In a criminal case the prosecution has a constitutional obligation to disclose to the defendant all exculpatory and impeachment evidence. *Robinson v. Mills*, 592 F.3d 730, 735 (6th Cir. 2010) (citing *Strickler v. Greene*, 527 U.S. 263, 280 (1999)). "Suppression by the prosecution of evidence favorable to an accused upon request violates dues process where the evidence is material to either guilt or ro punishment." *Brady*, 373 U.S. at 87.

To succeed on a *Brady* claim a defendant must show "(1) that the evidence in question [is] favorable; (2) that the state suppressed the relevant evidence . . . ; (3) and that the state's actions resulted in prejudice." *Robinson*, 592 F.3d at 735. In this case, Defendant failed to establish any of the elements required to demonstrate a *Brady* violation.

Regarding the first requirement, Defendant states that "[t]he United States' decision not to disclose Mitch/Slim's involvement prior to the trial precluded Mr. Hogan from furnishing the jury accurate facts about the buy/bust operation from the beginning of trial." ( Br. of Appellant, at 15.) Although Defendant describes the form in question as "exculpatory," Defendant nowhere explains the basis for this description. As a result, "Defendant presents his argument on [the *Brady*] issue in a perfunctory manner, providing no explanation of how the disclosed material would have altered his defense." *United States v. Blackwell*, 459 F.3d 739, 759 (6th Cir. 2006) (finding that "[n]o *Brady* violation occurred in this case.").

Regarding the second element, prosecution's disclosure of the form in question at the close of the first day of trial does not constitute suppression. "*Brady* generally does not apply to

delayed disclosure of exculpatory information, but only to a complete failure to disclose." *United States v. Kuehne*, 547 F.3d 667, 698 (6th Cir. 2008). *Brady* requires "only the production of material for its effective use at trial." *United States v. Bencs*, 28 F.3d 555, 561 (6th Cir. 1994). Only when "the delay itself causes prejudice" does the delay violate *Brady*. *Kuehne*, 547 F.3d at 698.

Although Defendant states that the delayed disclosure "precluded Mr. Hogan from furnishing the jury accurate facts about the buy/bust operation from the beginning of trial," (Br. of Appellant at 15), this bare statement is insufficient to support the contention that the delay itself prejudiced Defendant. Moreover, it is undisputed that to cure Defendant's complaints of prejudice subsequent to the government's disclosure of the form, the district court provided Defendant with the opportunity to call any additional witnesses or re-cross examine any witnesses, and also offered Defendant a continuance to prepare for trial in light of the disclosure. (2 Tr. of Record at 127.) However, Defendant failed to avail himself of any of these opportunities. This Court has consistently held that when the district court allows defendant to cure any prejudice due to delayed disclosure by calling or re-cross examining witnesses, "Defendant's failure to do so is not attributable to the government's violation of the principles set forth in *Brady*." *See, e.g., Blackwell*, 459 F.3d at 759; *United States v. Davis*, 306 F.3d 398, 421 (6th Cir. 2002); *Bencs*, 28 F.3d at 561.

Finally, Defendant's bare allegation that disclosure of Agent Borchgrevink's impeachment form "was prejudicial, and a violation of *Brady,*" does not satisfy *Brady*'s materiality requirement. *Brady* stated that the prosecution's suppression of favorable evidence "violates due process where

the evidence is material to guilt or punishment." *Brady*, 373 U.S. at 87. Under the *Brady* standard, "favorable evidence is material, and constitutional error results from its suppression by the government if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal citations omitted).

Although Defendant alleges that the delayed disclosure resulted in prejudice, Defendant does not describe the nature of the prejudice. Moreover, the disclosed evidence was relatively inconsequential. The district court did not abuse its discretion in finding no *Brady* violation, nor did it err in refusing to grant Defendant a new trial for the alleged *Brady* violations. Defendant has not demonstrated the form's materiality for *Brady* purposes, nor did Defendant avail himself of the remedies offered by the district court.

## B. Introduction of Recordings

### 1. Standard of Review

This Court reviews the district court's decision to admit portions of tape recordings "for an abuse of discretion." *United States v. Branham*, 97 F.3d 835, 850 (6th Cir. 1996).

### 2. Analysis

Defendant argues that the trial court abused its discretion by admitting into evidence composite audiotapes of Defendant's transaction with informant Greenwell. Defendant challenges the tapes' admission on several grounds: that the tapes were too unintelligible to be admissible, that "no foundation was laid whatsoever for the identification of the voices on those tapes," (Br. of

Appellant at 17) and that the trial court erred in permitting the prosecution to play only excerpts rather than the entire recordings.

"It is well settled that the admission of tape recordings at trial rests within the sound discretion of the trial court. That discretion presumes, as a prerequisite to admission, that the tapes be authentic, accurate and trustworthy . . . . Recordings will be deemed inadmissible if the unintelligible portions are so substantial as to render the recordings as a whole untrustworthy." *United States v. Robinson*, 707 F.2d 872, 876 (6th Cir. 1983) (internal citations and quotations omitted.).

On appeal the parties furnished the Court only with the excerpts played for the jury in the district court, and we find that the tapes are largely intelligible. *See United States v. Scarborough*, 43 F.3d 1021, 1024 (6th Cir. 1994) (affirming the district court's admission of a disputed tape, stating "we have reviewed the tape and also found it to be audible.").

Defendant also objects to the tapes on the basis of their authenticity. During the prosecution's direct examination of Agent Pierce he identified the two voices on the admitted recordings as the informant's and Defendant's. (1 Tr. of Record at 31, 42-43.) Although Agent Pierce admitted that he had never heard Defendant's voice when the first recording was taken, it is not disputed that Agent Pierce had an opportunity to familiarize himself with Defendant's voice after the first transaction was recorded.

The Federal Rules of Evidence require "authentication or identification as a condition precedent to admissibility." Fed. R. Evid 901(a). This requirement is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims," including voice. *Id*. Voice identification is admissible opinion testimony for the purpose of authenticating a

recording even if the witness became familiar with the identified voice subsequent to the time of the recording. *See United States v. Cooper*, 868 F.2d 1505, 1519 (6th Cir. 1989). Agent Pierce's familiarization with Defendant's voice subsequent to the date of the recording is an adequate basis for voice identification under Federal Rule of Evidence 901.

Finally, Defendant appeals admission of the composite tapes, as opposed to the entire recordings made during the transactions. Like the decision to admit recordings generally, the decision to admit "a composite tape, is within the sound discretion of the trial judge. A composite tape is admissible . . . when it saves the trial court much time and inconvenience." *United States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994).

As Defendant noted, the full recordings ran approximately 30 minutes. The composite tapes in evidence ran only about five minutes. In his order, the magistrate judge stated that the fact that "portions of the recording [are] indecipherable . . . does not necessarily render the entire recording inadmissible," Order at 3, *United States v. Hogan*, No. 06-0010 (E.D. Tenn. Dec. 3, 2008) (order denying use of transcripts), as "there are a few statements in the recording which potentially are incriminating." *Id*. at 4. However, the "isolated snippets of conversation" that can be understood are insufficient reason to expend half an hour of the court's time playing the largely incomprehensible remainder of the tape. *Id*. at 3. This interest in judicial economy is not clearly an abuse of discretion by the lower court. *Segines*, 17 F.3d at 854.

Furthermore, although the district judge did not admit the entirety of the recordings into evidence, Defendant had copies of the entire recordings, and was given express permission by the district court to play the tapes for the jury. (1 Tr. of Record at 6.) Defendant failed to avail himself

of that opportunity. *See United States v. Spearman*,186 F.3d 743, 755-56 (6th Cir. 1999) (quoting

*United States v. Branham*, 97 F.3d 835, 850 (6th Cir. 1996)) ("Defendants had the opportunity to

introduce the remaining tape recordings during the presentation of their evidence" but "chose not to

take advantage of that opportunity . . . [a]ny prejudicial effect by the court's exclusion was neutralized

by this fact.") As Defendant had the opportunity to play any portion or the entirety of the tape, "any

prejudicial effect caused by the court's exclusion was neutralized." *Id*. at 756. Therefore, the trial

court did not abuse its discretion in allowing the government to play only portions of the tape.

### C.      Use of Transcripts

#### 1.      Standard of Review

This Court reviews a jury's use of a transcript "under an abuse of discretion standard."

*United States v. Jacob*, 377 F.3d 573, 581 (6th Cir. 2004).

#### 2.      Analysis

Whether to use transcripts as an aid to the jury in deciphering a recording is "a matter

committed to the trial court's discretion." *Robinson*, 707 F.2d at 876. "[A] defendant challenging

the use of a transcript at trial must show prejudice." *Jacob*, 377 F.3d at 581.

In this case, Defendant argues that he was prejudiced by the transcripts furnished to the jury

for three principal reasons: (1) because "the tapes were so incomprehensible that the transcripts

themselves would become evidence," (Br. of Appellant at 18); (2) because the transcripts "contained

additional testimonial information" such as "names for purported speakers;" and (3) because "the

transcripts used reinforced the inaccurate nature of the composite tapes . . . by failing to include any

time markers, note gaps . . . all of which change the context of the live event purportedly recorded."

*Id*.

"The preferred method" of approving a transcript for use as an aid to a jury "is stipulation to its accuracy by all parties. The next best alternative is for the transcriber to attest to its accuracy and for the court to test its accuracy, outside of the jury's presence, by reading the transcripts while listening to the tapes." *Segines*, 17 F.3d at 854.

In this case, the preferred method of approval was not used. Order at 5, *Hogan*, No. 06-0010 (order denying use of transcripts). The secondary alternative for transcript approval was generally followed. "[T]he magistrate judge listened to the original recording while simultaneously reading a transcript of those recordings as each was played." *Id.* Moreover, the magistrate judge determined that "[s]ince the magistrate judge listened to the recordings while reading the transcripts, the testimony of the transcriber would have been superfluous." *Id*.

Defendant also contests the use of the transcripts based on the tapes' unintelligibility. "When the tapes are unintelligible . . . a transcript intended as an aid to the jury inevitably becomes, in the minds of the jurors, the evidence itself." *Segines*, 17 F.3d at 854. At the second *in camera* review in which the magistrate judge ultimately permitted transcripts to be used, "[a]s the recordings were played in court, the magistrate judge attempted to compare the transcripts with what he was hearing on the record." Order at 6, *United States v. Hogan*, No. 06-0010 (order approving use of transcripts). At the hearing the magistrate judge determined that

> portions of the recording are so clear that no transcript is needed to understand what was said. Some portions of the recordings that are somewhat unclear and garbled . . . the spoken words on the recordings become easily understood while reading the transcript, and there is no doubt that the corresponding portion of the transcript reflects accurately what was said

in the recording itself. Unfortunately, in other instances, incomprehensible and inaudible portions of the recordings remain incomprehensible even though the transcript was being simultaneously read.

*Id.* at 5. The magistrate judge recognized that using the transcript for the inaudible portion was improper. Therefore, the magistrate judge underlined the portions of the transcript corresponding to audible parts of the recording, and ordered that the inaudible portions that were not underlined be excised from the transcript, and referred to as "unintelligible." *Id.* at 6.

When it provided the transcripts for use as an aid to the jury the district court instructed the jury that the transcripts themselves were only an aid for understanding the recordings, and were not themselves evidence. (1 Tr. of Record at 32, 43.) *See Segines*, 17 F.3d at 854. "Such an instruction does not suffice, however, to erase the prejudice created by shepherding hearsay to the jury via the transcripts." *Id.* Even "the directives" of an adequate jury instruction "are only viable when the tape is clear enough for a juror to detect that the tape is at variance with the transcript. But where . . . the tapes are partially inaudible, the juror is precluded from making an intelligent comparison. Hence the likely result is that the transcripts become evidence." *Robinson,* 707 F.3d at 878. By striking out the unintelligible portions of the recording from the transcript the magistrate judge avoided impermissibly "shepherding hearsay to the jury." The jury instruction plus the magistrate judge's diligence in approving the transcripts for the jury's use safeguarded Defendant from being prejudiced by the jury's use of the transcripts. The district court did not abuse its discretion and prejudice Defendant by permitting the jury to use the transcripts under these circumstances.

Neither did Defendant suffer prejudice from the transcript's identification of Defendant as one of the speakers. Agent Pierce identified Defendant's voice as a speaker on the recording, and Agent

Pierce was available for cross-examination on this point. *See United States v. Crane*, 632 F.2d 663, 664-65 (6th Cir. 1980) (When the "agent . . . who identified [defendant's] voice as the party on the tapes . . . was available for cross-examination, defendant should not be heard to complain."). *Cf. United States v. Ford*, 187 Fed. App'x 496, 501 (6th Cir. 2006) ("[Witnesses] both testified regarding their knowledge that [defendant] was, in fact, one of the speakers. Their availability for cross-examination negates any prejudice to [defendant].").

Finally, Defendant's contention that "the transcripts used reinforced the inaccurate nature of the composite tapes . . . by failing to include any time markers, note gaps . . . all of which change the context of the live event purportedly recorded," (Br. of Appellant at 18), does not demonstrate prejudice. Defendant's contention is a bare assertion, unsupported by fact or law. Moreover, this contention is simply a recasting of Defendant's assertion that he was prejudiced by the admission of composite, rather than full, tapes. As discussed above, that the district court permitted Defendant to play any and all sections of the tape for the jury neutralizes any prejudice Defendant may have suffered from the composite tapes' admission. The district court did not abuse its discretion in furnishing the jury with transcripts of the admitted recordings.

### III. CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's decision.