[Cite as *State v. Hernandez*, 2022-Ohio-3011.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
| --- | --- | --- |
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. Wiliam B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2021 CA 0046 |
| LISA HERNANDEZ | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:     Criminal appeal from the Richland County
                             Court of Common Pleas, Case No. 2020-
                             CR-0661

JUDGMENT:                    Affirmed

DATE OF JUDGMENT ENTRY:      August 30, 2022

APPEARANCES:

For Plaintiff-Appellee              For Defendant-Appellant

GARY BISHOP                         WILLIAM CRAMER
Prosecuting Attorney                470 Olde Worthington Road
JODIE SCHUMACHER                    Suite 200
Assistant Prosecutor                Willoughby  OH 44096
38 South Park Street, Second Floor
Mansfield, OH 44902

*Gwin, P.J.*

**{¶1}** Defendant-appellant Lisa Hernandez ["Hernandez"] appeals her convictions and sentences after a jury trial in the Richland County Court of Common Pleas.

*Facts and Procedural History*

**{¶2}** On August 23, 2020, Joey Hildebrand sold an F-150 for $1,900. He still had the cash on his person the next day. 1T. at 231-232.[1]

**{¶3}** On August 24, 2020, Mr. Hildebrand got off work at 4:30 P.M. and went to see his girlfriend Rebeccah Lewis. Ms. Lewis lived at 695 Coachman Road in Richland County, Ohio. She and Mr. Hildebrand had been dating for a few weeks. 1T. at 226. Early in their relationship, Mr. Hildebrand told Ms. Lewis that he had a conviction for unlawful sexual conduct with a minor from 2007, a conviction for which he served his time and for which he is compliant with his registration. Id. at 226-227. Mr. Hildebrand told her this because he believed it was easier to be up front about that sort of information. Mr. Hildebrand said that Ms. Lewis was fine with it; she told him, "(E)verybody makes mistakes." 1T. at 230.

**{¶4}** In the late afternoon/early evening of August 24, 2020, when Mr. Hildebrand arrived at Ms. Lewis's home several people were at the home. 1T. at 233. Ms. Lewis was a drug user and she and others used drugs in the house just about every day. Ms. Lewis smoked "ice," which is methamphetamine. Id. at 234. Mr. Hildebrand was not a drug user, and though he did admit to previously smoking marijuana, he had been clean

---

[1] For clarity, the jury trial transcript will be referred to as, "__T.__," signifying the volume and the page number.

a long time. He and Ms. Lewis had discussed her getting clean and he wanted to support her in her efforts.

{¶5} Craig Yosick, also known as Crack Back, was one of the people at Ms. Lewis's home when Mr. Hildebrand arrived. Mr. Hildebrand believed that Mr. Yosick and Ms. Lewis dated in the past.

{¶6} During the next several hours, Ms. Lewis, and the rest of the people hanging around the home started questioning Mr. Hildebrand about his conviction and his record. The individuals became pushy and aggressive. 1T. at 238. Much of what was said was not true and Mr. Hildebrand tried to diffuse the situation.

{¶7} The other individuals had left the home and only Ms. Lewis and Mr. Yosick remained in the residence with Mr. Hildebrand. Mr. Yosick rolled a marijuana joint and told Mr. Hildebrand to smoke it. 1T. at 239. Mr. Hildebrand tried to comply; however, he became disoriented and started sweating and throwing up. Mr. Hildebrand testified that he got sick to his stomach and threw up if he smoked marijuana. Id. at 240. Mr. Yosick gave Mr. Hildebrand a glass of water and, after drinking the water, Mr. Hildebrand became more disoriented.

{¶8} While Mr. Hildebrand was trying to recover, Mr. Yosick grabbed a pipe, approximately twelve inches long, and one-half inch in diameter. Ms. Lewis brought out a knife, about twelve inches long, from the bedroom. 1T. at 242. Mr. Hildebrand started to become scared. The pair told Mr. Hildebrand to strip down and they took him into the bathroom. They took his wallet with the money from the sale of his vehicle, his keys, and his phone. Mr. Hildebrand recounted,

They took me into the bathroom, and there was a chair sitting in the bathtub. There was plastic down in the bathtub. And they tied me to the chair. * * * I'm trying to think of a way out of this.

Id. at 243-244. Mr. Yosick hit Mr. Hildebrand in the face several times. Mr. Yosick and Ms. Lewis began accusing Mr. Hildebrand of being a "CI," a confidential informant, for METRICH (Metro Richland County Enforcement Unit) because he had never used methamphetamine and said he never would use drugs. Mr. Hildebrand also saw a battery charger and cables on the floor. He testified that "they" were going to use it on him but they could not get it to work. 1T. at 265. Mr. Yosick and Ms. Lewis left the bathroom.

After some time passed, they came back into the bathroom with Hernandez. Hernandez was wearing a mask on the lower part of her face, a ball cap, and glasses. Mr. Hildebrand could tell it was Hernandez by her voice, because Hernandez has a unique voice. Mr. Hildebrand had known Hernandez for ten years or more, and he could recognize her voice. Mr. Hildebrand testified that the mask Hernandez was wearing was the same mask she wore in a Facebook picture. 1T. at 265. When Hernandez came into the bathroom, she immediately kicked Mr. Hildebrand in the face with her boot. Hernandez joined the other two in taunting Mr. Hildebrand, calling him a snitch and a child molester. Hernandez took turns with Mr. Yosick and Ms. Lewis smacking Mr. Hildebrand. Hernandez then picked up the knife and stabbed Mr. Hildebrand in the right leg, above his knee, while laughing about it. 1T. at 247. Mr. Yosick said he kicked and hit Mr. Hildebrand because "I was pissed off because of what Rebeccah had told me. * * * Rebeccah said he raped a girl." 4T. at 621. Mr. Yosick confirmed Hernandez was wearing boots when she went into the bathroom. 4T. at 624.

{¶9} During the night or in the morning of August 25, 2020, Hernandez and Ms. Lewis spoke to a fourth person, Carl Murphy, on the phone to ask what he thought they should do with Mr. Hildebrand. 1T. at 248-249. Mr. Hildebrand could hear both sides of the conversation because Ms. Lewis put the phone on speaker mode. He heard Carl Murphy say, "Kill the sick f*ck. A child molester doesn't deserve another chance." 1T. at 249. Mr. Hildebrand knew Mr. Murphy through the person who had purchased his F-150. After the call, they shoved an unknown powder down Mr. Hildebrand's throat. 1T. at 249. Mr. Hildebrand was left alone for a while; however, he could hear fighting between Mr. Yosick and Ms. Lewis. The fighting was so violent that one of them partially ripped the bathroom door off the hinges.

{¶10} When they went back into the bathroom, Hernandez, Ms. Lewis, and Mr. Yosick were laughing and joking and they began taking pictures. Mr. Yosick pulled out a butane torch lighter and started running it back and forth near Mr. Hildebrand's genitals. Mr. Hildebrand said the torch was kept at a distance but it was close enough for him to be able to feel it. He believed he had been burned but could not check, because he was tied up. The three, Hernandez, Ms. Lewis, and Mr. Yosick, continued laughing, joking, and taking pictures. They left him alone in the bathroom again, this time possibly for a couple of hours.

{¶11} Sometime later, Hernandez, Ms. Lewis, and Mr. Yosick returned to the bathroom. They untied Mr. Hildebrand from the chair; however, they made sure his hands were still tied behind his back. A blanket was placed over Mr. Hildebrand's head. Hernandez and Ms. Lewis put Mr. Hildebrand in the back of his own SUV. Mr. Hildebrand's face was not completely covered when they put him in the vehicle. Mr.

Hildebrand could see Hernandez in the passenger seat. Ms. Lewis, who was driving, stopped at one point and got out. Mr. Hildebrand was left with Hernandez in the car. As he was attempting to untie his hands, Hernandez hit him on the head with something and told him to stop moving. The jury was showed a short surveillance video depicting Hildebrand's SUV at a gas station around 5:00 p.m. on August 25th. Ms. Lewis could be seen getting gas for it; however, Hernandez was not visible in the video. 2T. at 295-297; 344-345. State's Exhibit 15.

{¶12} Ms. Lewis got back in the vehicle and they drove around for hours. Finally, they pulled into a field and she stopped the car. Mr. Hildebrand was able to get free from his bindings. When Ms. Lewis opened the back door, he pushed her back and ran as fast as he could without looking back. Mr. Hildebrand ran through a field to a farmer's house and knocked on the door for help.

{¶13} Jeffrey Irelan, the owner of the house, said that Mr. Hildebrand told him "he had been attacked and drugged and they had torched him." 2T. at 358. Mr. Irelan said that it looked like he was going into convulsions. Mr. Irelan said that Mr. Hildebrand had injuries to his eye, legs, and face, and that he looked like he had been "thoroughly beat." Id. at 361.

{¶14} Mr. Hildebrand's SUV was found engulfed in flames in an isolated field the morning of August 25, 2020. Adam Faith, who happened to be driving by, found it. There was nothing left of the vehicle. The paint was burned off, the tires were melted off or were burned in the fire, and there was nothing identifiable inside the vehicle. There was a 5-gallon motor oil can about 20 feet from the vehicle with a trail of grass still on fire from the can to the vehicle when Mr. Faith happened upon the SUV. After Deputy Pawlikowski of

the Richland County Sheriff's Office arrived, the burned license plate was found on the ground behind the vehicle. Deputy Pawlikowski described the oil can as smelling of gasoline.

{¶15} Deputy Justin Ady, of the Richland County Sheriff's Office was the first law enforcement officer to speak to Mr. Hildebrand after the attack. He observed injuries to Mr. Hildebrand's left eye and a wound to his knee, both of which had dried blood on them and appeared to have been bleeding recently. 3T. at 370. Deputy Ady also observed a knot to Mr. Hildebrand's head. Deputy Ady called for EMS and a squad from Franklin Township responded. Deputy Ady followed the squad to the hospital.

{¶16} At the hospital, Deputy Ady testified, Mr. Hildebrand appeared to be wearing a crop top type of shirt and that he was not "fully clothed for the weather." 3T. at 373. The clothing did not look like it fit him. He also appeared to have women's underwear around his neck. Mr. Hildebrand told Deputy Ady that "Rebeccah Lewis, Lisa Hernandez, a guy named Crack Back and someone named Carl, I believe Carl Miller," were involved in the incident. Id. at 377.

{¶17} Mr. Hildebrand had no recollection of any conversations with or statements made to law enforcement, either at Mr. Irelan's home or at the hospital.

{¶18} Mr. Hildebrand remembered making a statement to Detective Giovanni Masi at the Richland County Sheriff's Office the next day but did not remember what he said to Detective Masi. Detective Masi first met Mr. Hildebrand at OhioHealth in Mansfield in the emergency room. Mr. Hildebrand provided Detective Masi with the names of the people involved: Rebeccah Lewis, a guy named Crack Back, and Lisa Hernandez. Mr.

Hildebrand also provided the location of the assault: 695 Coachman Road in Mansfield, Ohio.

{¶19} Mr. Hildebrand did not remember the pictures law enforcement showed him. Mr. Hildebrand did pick one of the photographs but her hair was different and he was not able to give a confidence statement. Mr. Hildebrand testified that he has vision difficulties. Out of his left eye, he "can't make anything out as far as like faces or writing [.]" 2T. at 293. He can only see movement out of his left eye. Out of his right eye, at a distance, details are blurry until they are about eight feet from him. Id. at 293-294. Mr. Hildebrand never shared this information with anyone during the photo lineup or at any time during the course of the investigation. 2T. at 299.

{¶20} The Richland County Sheriff's Office was informed that Hernandez was arrested in Oklahoma County, Oklahoma, for stealing a pack of baloney. Detective Jason Shoemaker contacted the agency in Oklahoma and requested access to Hernandez's jail calls and visitation records. During one of the calls, Hernandez discusses with the person getting ahold of Hildebrand to try to get him to retract his statement to the police. 3T. at 574-575. In another call, Hernandez mentions that he was "tied up," "chopped his dick off," and "torched his car." Id. at 575. The other person on the line was identified as Eddie Blystone. Blystone looked up felonious assault on the internet for Hernandez, who had asked him to find out what the maximum sentence was on felonious assault. Id. at 575. Hernandez then asked Blystone about other possible charges, such as kidnapping and arson. Id. at 575-576. Detective Shoemaker testified that, when Hernandez was in the Oklahoma County jail, her warrant was only for felonious

assault; therefore, when Hernandez was talking about arson and kidnapping, the detective believed that it showed her knowledge of the case. Id. at 576-577.

{¶21} Hernandez told Blystone to look at her Facebook page. She claimed that Joey Hildebrand was sending her messages on Facebook. Id. at 577. Hernandez identified Carl Murphy and told Blystone that Murphy "told the cops everything." Id. at 578. Hernandez said that, "Beccah and Craig had started the whole thing." Id. In a call to an unknown male on September 23, 2020, Hernandez said, "I fuckin' cut and chopped a guy's dick off. Yeah. He raped a little girl and I got his ass." She then laughed. 3T. at 572.

{¶22} The recordings of Hernandez's jail telephone calls were played for the jury. State's Exhibit 92.

{¶23} Hernandez discussed her participation in the assault with fellow inmates while awaiting trial. Hernandez told fellow inmate Candace Marie Corbitt, that she had kidnapping charges and felonious assault charges for assaulting Mr. Hildebrand. 4T. at 701. Hernandez talked about "how they had beat and tortured this guy, how they had planned to kill him, but he escaped the vehicle. * * * [S]he wasn't sure how he escaped, because she had the child safety locks on...they burned his car." Id. at 702. Hernandez told Ms. Corbitt the three people involved in the crimes were herself, Rebeccah Lewis, and Craig Yosick. Id. at 702. Hernandez explained to Ms. Corbitt the two reasons for the attack on the victim, who Hernandez named as Joey Hildebrand. The first was that he was working with the police, because he was around drug users but did not use drugs himself. The second was because he was a child molester. Id. at 703. Hernandez said that Mr. Hildebrand had $1,800 in his wallet and they used that to buy drugs. Hernandez

laughed about all of this.  Corbitt was disturbed by the story and informed a corrections officer.

{¶24}  Carl Yosick testified that his mind was a blur because he had been awake and high on meth for thirteen days.  Ms. Lewis was also getting high on meth with him around that time.  Yosick had previously partied with Hernandez, but she mostly stuck with marijuana and did not use drugs on the night in question. After having his recollection refreshed with a video of his police interrogation, Mr. Yosick admitted that he, Lewis, and Hernandez participated in what happened to Mr. Hildebrand.  Mr. Yosick testified that Mr. Hildebrand was tied to a chair in the bathtub.  Mr. Yosick admitted taking part in hitting and kicking Mr. Hildebrand.  Mr. Yosick said he was angry because Lewis said that Mr. Hildebrand raped a couple of girls.  Mr. Yosick said that Hernandez arrived just before Mr. Hildebrand was removed from the bathtub.  Yosick said that Hernandez was wearing boots.

{¶25}  Mr. Yosick admitted telling the police that Hernandez had a knife and stabbed Mr. Hildebrand; however, he testified at trial that she did not stab him; she only swung at him with the knife.  Mr. Yosick was shown a photograph of Mr. Hildebrand tied up in the tub with someone standing over him.  Mr. Yosick said he thought the person standing over Mr. Hildebrand was Hernandez.  Mr. Yosick told the police that Hernandez was on the phone with her boyfriend, Carl Murphy during the incident. Mr. Yosick said that Ms. Lewis tied up Mr. Hildebrand.  Mr. Yosick claimed he was not present for that because he was waiting in the kitchen for some drugs to arrive. Mr. Yosick testified that Ms. Lewis used a battery charger to try to scare Mr. Hildebrand by threatening to electrocute him.  Mr. Yosick testified he and Ms.

Lewis got into an argument over money that night. Ms. Lewis hit him a couple of times and they broke the bathroom door. Mr. Yosick further testified Mr. Hildebrand was force fed Tylenol P.M. in the morning by Lewis

{¶26} Mr. Yosick testified that he was in and out of the house because he was obtaining drugs. At one point, he returned and found Mr. Hildebrand tied up in the bathtub. Ms. Lewis said Mr. Hildebrand tried to push himself on her sexually. Ms. Lewis had Mr. Yosick sit with Mr. Hildebrand while she went to get Hernandez. 4T. at 661-663. Mr. Yosick testified that all three of them punched or kicked Hildebrand, but he never saw Hernandez stab him. 4T. at 665-666. Mr. Yosick told the police during his first statement that he saw Hernandez cut Mr. Hildebrand with the knife, but Mr. Yosick testified that he was still high when he gave that statement. Id. at 673. During his second statement, Mr. Yosick said he saw Hernandez with a knife and threw her up against the wall to try to stop her from bringing the knife into the bathroom. Id. 673-674.

{¶27} Mr. Yosick testified that Ms. Lewis stripped Mr. Hildebrand naked and had him seated in the kitchen around 3:30 a.m. when someone came over to buy drugs. Ms. Lewis let the person in and Mr. Yosick conducted the drug transaction while Ms. Lewis moved Mr. Hildebrand to the bathroom. Hernandez was not there at this time. 3T. at 669-670.

{¶28} Mr. Yosick testified that he pled guilty to kidnapping, aggravated robbery, and felonious assault. Mr. Yosick pled guilty to robbery because he took $240 from Hildebrand's wallet and gave Ms. Lewis half the money. Mr. Yosick admitted that Hernandez was not there when he took the money from Mr. Hildebrand's wallet. Id. at 663-665.

{¶29} On October 9, 2020, an eight-count indictment was filed against Hernandez, charging her with (1), kidnapping to facilitate a felony in violation of R.C. 2905.01(A)(2), a first degree felony; (2) kidnapping to terrorize or inflict serious physical harm in violation of R.C. 2905.01(A)(3), a first degree felony; (3) felonious assault causing physical harm in violation of R.C. 2903.11(A)(1), a second degree felony; (4) felonious assault with a deadly weapon in violation of R.C. 2903.11(A)(2), a second degree felony; (5) aggravated robbery with a deadly weapon in violation of R.C. 2911.01(A)(1), a first degree felony; (6) aggravated robbery inflicting serious physical harm in violation of R.C. 2911.01(A)(3), a first degree felony; (7) tampering with evidence in violation of R.C. 2921.12(A)(1), a third degree felony; and (8) arson causing physical harm to property in violation of R.C. 2909.03(A)(1), a fourth degree felony.

{¶30} At the start of the trial, the trial court granted the state's motion to amend count five to robbery inflicting physical harm in violation of R.C. 2911.02(A)(2), a second-degree felony, and to dismiss count six aggravated robbery.

{¶31} The trial began on May 11, 2021 and continued through May 19, 2021. Hernandez was found guilty and was sentenced to prison for the following terms: Count 1: eleven years minimum to sixteen and a half years maximum.  Count 2: Merged with Count 1.  Count 3: Eight years.  Count 4: Merged with Count 3.  Count 5: Eight years. Count 6: Dismissed.  Count 7: Thirty-six months.  Count 8: Merged with Count 7.  These sentences were ordered to be served consecutively.

{¶32} Hernandez was sentenced to an aggregate minimum term in prison of thirty years to a maximum term of thirty-five and a half years.  Hernandez was also found to be

convicted of a qualifying violent offender offense as defined in R.C. 2903.41. Her sentence includes five years of mandatory post-release control.

*Assignments of Error*

{¶33} Hernandez raises three Assignments of Error,

{¶34} "I. APPELLANT'S CONVICTIONS ARE AGAINST THE WEIGHT OF THE EVIDENCE.

{¶35} "II. APPELLANT'S STATE AND FEDERAL DUE PROCESS RIGHTS TO A FAIR TRIAL WERE VIOLATED WHEN THE TRIAL COURT FAILED TO INSTRUCT THE JURY TO VIEW ACCOMPLICE TESTIMONY WITH "GRAVE SUSPICION" AS REQUIRED BY R.C. 2923.03(D).

{¶36} "III. APPELLANT WAS DEPRIVED OF HER STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO RENEW A REQUEST FOR A JURY INSTRUCTION WARNING THE JURY TO VIEW ACCOMPLICE TESTIMONY WITH "GRAVE SUSPICION."

I.

{¶37} In her First Assignment of Error, Hernandez argues that her convictions are against the manifest weight of the evidence. Specifically, Hernandez contends that the evidence identifying her as a participant in the crimes is not worthy of belief.

**Standard of Appellate Review – Manifest Weight.**

{¶38} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient. *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as*

*stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

> "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

> \* \* \*

> "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

{¶39}  The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve.  *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001); *State v. Murphy*, 4th Dist. Ross No. 07CA2953, 2008–Ohio–1744, ¶ 31. Because the trier of fact sees and hears the witnesses and is particularly competent to decide whether, and to what extent, to credit the testimony of particular witnesses, the appellate court must afford substantial deference to its determinations of credibility. *Barberton v. Jenney,* 126 Ohio St.3d 5, 2010–Ohio–2420, 929 N.E.2d 1047, ¶ 20.  In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe."  *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002–

Ohio–1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999). Thus, an appellate court will leave the issues of weight and credibility of the evidence to the fact finder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 4th Dist. Pickaway No. 11CA9, 2012–Ohio–1282, ¶ 24.

**{¶40}** Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." Id.

**Issue for Appellate Review**: *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered.*

**{¶41}** There is no dispute in the case at bar that the crimes against Mr. Hildebrand as alleged in the indictment had in fact occurred. Hernandez's main argument is that the evidence to identify her as the perpetrator of those crimes is not worthy of belief.

### Voice identification.

**{¶42}** Mr. Hildebrand was able to identify Hernandez from her voice, having known her for over ten years. Hernandez's face was partially covered while the beatings were taking place; however, she spoke numerous times throughout the evening. The jury

heard Hernandez's voice on the telephone calls she made while in jail.  State's Exhibit 92[2].

{¶43}  Pursuant to Evid.R. 901(B)(5), voice identification is admissible in trials as follows: "Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

> The standard of admissibility for an "opinion identifying a person's voice" is a low one.  Fed. R. Evid. 901(b)(5).  If the identifying witness has "heard the voice of the alleged speaker at *any* time," his testimony is admissible.  *United States v. Cooke*, 795 F.2d 527, 530 (6th Cir. 1986) (emphasis added) (quotation omitted); *see also United States v. Hogan,* 402 F. App'x 54, 59 (6th Cir. 2010) (noting voice-identification testimony was admissible even if the witness acquired familiarity with the voice after the time of recording).  What's more, a witness's familiarity with a voice need not come from "face-to-face conversation."  *Pryor*, 842 F.3d at 452.  "Nor must the witness be qualified as an expert."  Id. (citation omitted).

*United States v. Gardner,* 32 F.4th 504, 521(6th Cir. 2022).

{¶44}  The jury heard Mr. Hildebrand identify Hernandez by her voice.  A recording of a jail call was played in the courtroom, without prior identification, and Hildebrand identified the voice as Hernandez's voice.  2T. at 305-306; 336.

---

[2] Hernandez does not challenge the admission of the jail telephone calls during her jury trial or that Hernandez identified herself on the recordings during those calls.

### Visual identification

**{¶45}** Mr. Hildebrand was unable to positively identify Hernandez from a photographic array. He was not able to identify Hernandez in the courtroom, pointing instead to one of the jurors whom he indicated looked a lot like her.

**{¶46}** Mr. Hildebrand was able to see Hernandez's face before he escaped from the SUV. 1T. at 254. Mr. Hildebrand testified that the mask Hernandez was wearing was the same mask she wore in a Facebook picture. 1T. at 265. After the attack, Mr. Hildebrand consistently identified Hernandez as one of his attackers. 3T. at 377; 5T. at 788-789.

### Photographic evidence

**{¶47}** Photographs recovered from cell phones taken from the residence depicted Hernandez participating in the torture of Mr. Hildebrand. 1T. at 263-268; 5T. at 850-859; State's Exhibit 2, 3, 5.

### Jail telephone calls made by Hernandez

**{¶48}** In calls made while she was incarcerated, Hernandez attempted to have Mr. Hildebrand persuaded to retract his statement to the police. 3T. at 574-575. State's Exhibit 92. Hernandez further indicated her familiarity with intimate details of the crimes. 3T. at 575-577. Hernandez identified the other participants in the crimes during the calls from the jail. 3T. at 578.

### Cellmate's testimony

**{¶49}** Hernandez talked with a fellow inmate about "how they had beat and tortured this guy, how they had planned to kill him, but he escaped the vehicle. * * * [S]he wasn't sure how he escaped, because she had the child safety locks on...they burned his

car."  Id. at 702.  Hernandez told the fellow inmate that the three people involved in the

crimes were herself, Rebeccah Lewis, and Craig Yosick.  Id. at 702.  Hernandez displayed

intimate knowledge concerning the details of the crimes.

{¶50}  There was no evidence presented that the cellmate obtained information

concerning the crimes from any sources other than Hernandez.  Hernandez's arguments

in that respect are nothing more than unsubstantiated conjecture.

{¶51}  In the case at bar, Hernandez concedes that sufficient evidence was

presented to support her convictions.  Her arguments relate solely to the weight of the

evidence.

{¶52}  The jury as the trier of fact was free to accept or reject any and all of the

evidence offered by the parties and assess the witness's credibility.  "While the trier of

fact may take note of the inconsistencies and resolve or discount them accordingly * * *

such inconsistencies do not render defendant's conviction against the manifest weight or

sufficiency of the evidence."  *State v. Craig*, 10th Dist. Franklin No. 99AP–739, 1999 WL

29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996

WL 284714 (May 28, 1996).  Indeed, the trier of fact need not believe all of a witness'

testimony, but may accept only portions of it as true.  *State v. Raver*, 10th Dist. Franklin

No. 02AP–604, 2003–Ohio–958, ¶ 21, *citing State v. Antill,* 176 Ohio St. 61, 67, 197

N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP–1238, 2003–Ohio–2889,

*citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992).  Although

the evidence may have been circumstantial, we note that circumstantial evidence has the

same probative value as direct evidence.  *State v. Jenks*, 61 Ohio St.3d 259, 272, 574

N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional*

*amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).

**{¶53}** In the case at bar, the jury heard the witnesses subjected to cross-examination, saw the photographs, and heard the audio recordings. The jury was able to observe Hildebrand, Yosick, and Corbett subjected to cross-examination. The jury heard Hernandez's attorney's arguments and explanations about the evidence and her actions. Thus, a rational basis exists in the record for the jury's decision.

**{¶54}** We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355, quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Based upon the foregoing and the entire record in this matter we find Hernandez's convictions are not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Hernandez's guilt. The jury neither lost their way nor created a miscarriage of justice in convicting Hernandez of the offenses.

**{¶55}** Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes for which Hernandez was convicted.

**{¶56}** Hernandez's First Assignment of Error is overruled.

II.

**{¶57}** In her Second Assignment of Error, Hernandez asserts the trial court committed plain error in failing to include an instruction on accomplice testimony pursuant to R.C. 2923.03(D).

**Standard of Appellate Review**

**{¶58}** Recently, the Ohio Supreme Court reviewed the plain error standard of review to be utilized by appellate courts,

> Under this standard, the defendant bears the burden of "showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16. An appellate court has discretion to notice plain error and therefore "is not required to correct it." *Rogers* at ¶ 23.

*State v. West*, Slip Op. 2022-Ohio-1556, ¶ 22. *See also State v. McAlpin,* Slip Op. No. 2022-Ohio-1567, ¶ 90 ("McAlpin could not establish plain error, because he cannot show a reasonable probability that but for standby counsel's actions, the jury would have acquitted him.").

**Issue for Appellate Review:** *Whether but for the failure of the trial court to instruct the jury on accomplice testimony pursuant to R.C. 2923.03(D) the jury would have acquitted Hernandez.*

**{¶59}** In the case at bar an alleged accomplice, Carl Yosick testified. R.C. 2923.03(D) provides:

If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

**{¶60}** It is undisputed in the present case that no "grave suspicion" instruction was given to the jury. However, the failure to instruct the jury under R.C. 2923.03(D) does not automatically give rise to a finding of plain error if "[t]here is a sufficient amount of evidence in the record, independent of any accomplice testimony, which supports a conviction of these charges on appellant's action alone." *State v. Crawford*, 10th Dist. No. 01AP-1428, at ¶ 27, 2003-Ohio-1447, *citing State v. McKinney* (Mar. 6, 1990) Franklin App. No. 89AP-466. "Plain error will not be found unless the defendant establishes that the outcome of the trial clearly would have been different but for the trial court's error." Id. at ¶28 (Citation omitted). *See also, State v. Chatfield,* 5th Dist. Licking No. 2008CA0034, 2009-Ohio-856, ¶51.

**{¶61}** In *State v. Davis*, the Ninth District Court of Appeals articulated a number of factors to review when the trial court fails to give an instruction on accomplice testimony in the absence of a request to do so,

> When determining whether the trial court committed plain error by failing to comply with R.C. 2923.03(D), this Court examines several factors. We look to the record to determine the scope of cross-examination of the accomplice that was permitted by the trial court.* * * Further, we review whether the details of the accomplice's plea agreement were presented to the jury and whether the jury instructions that were actually given contain much of the substance of the instructions mandated by R.C. 2923.03(D). Finally, we examine whether the accomplice's testimony was favorable to the defendant, justifying defense counsel's failure to request the required instruction as a tactical decision. * * *. [Internal citations omitted].

*Davis*, Ninth Dist. Summit No. 22395, 2005–Ohio–4083, ¶16. *See also*, *State v. Riley*, 5th Dist. Muskingum No. CT2012-0022, 2013-Ohio-1332, ¶24.

**{¶62}** In the case at bar, the scope of cross-examination of Mr. Yosick was extensive and without constraint by the trial court. The jury was told of his plea agreement with respect to his involvement in these crimes. 4T. at 631- 633. Further, the jury was informed of the charges to which Mr. Yosick pled guilty. Id. Mr. Yosick's testimony was not entirely unfavorable to Hernandez. At one point, the prosecutor asked the trial court to declare Mr. Yosick a hostile witness. 4T. at 616-619. The jury instructions, as in *Davis,* contained only the standard language about witness credibility.

{¶63} As we have discussed in our disposition of Hernandez's First Assignment of Error, Mr. Hildebrand identified Hernandez as participating in the crimes. Further, Hernandez's own words in the form of her recorded telephone conversations while in jail linked her to the crimes. Photographic evidence documented Hernandez's presence and corroborated Mr. Hildebrand's testimony. Finally, testimony from a former cellmate of Hernandez was introduced that related Hernandez's comments admitting her participation in the crimes.

{¶64} Upon careful review of the record, we find that although the trial court erred in failing to charge the jury with the mandatory instruction under R.C. 2923.03(D), there was sufficient evidence presented linking Hernandez to the crimes in the absence of Mr. Yosick's testimony.

{¶65} Accordingly, we do not find plain error in the trial court's failure to give the instruction on accomplice testimony.

{¶66} Hernandez's Second Assignment of Error is overruled.

III.

{¶67} In her Third Assignment of Error, Hernandez contends that her trial counsel was ineffective in failing to request a jury instruction on accomplice testimony.

**Standard of Appellate Review**

{¶68} "To prevail on a Sixth Amendment claim alleging ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient and that his counsel's deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 694 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficiency, a defendant must show that "counsel's representation fell below an objective standard of reasonableness."

Id., at 688, 104 S.Ct. 2052.  In addition, to establish prejudice, a defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694, 104 S.Ct. 2052.  *Andtus v. Texas,* 590 U.S. __, 140 S.Ct. 1875, 1881, 207 L.Ed.2d 335 (June 15, 2020).

**Issue for Appellate Review**: *Whether there is a reasonable probability that, but for counsel's failure to request a jury instruction on accomplice testimony pursuant to R.C.  2923.03(D), the jury would have acquitted Hernandez.*

{¶69}  In the case at bar, Hernandez did not request an instruction on complicity and objected to the instruction being given to the jury.  1T. at 188-190; 6T. at 961-963. Defense counsel indicated that an instruction would not be sought in the event Mr. Yosick testified favorably toward Hernandez.  Id.  The trial court instructed the jury generally on assessing the credibility of witnesses.  6T. at 968-969.

{¶70}  Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel.  *State v. Phillips*, 74 Ohio St.3d 72, 85, 1995–Ohio– 171, 656 N.E.2d 643.  Even if the wisdom of an approach is questionable, "debatable trial tactics" do not constitute ineffective assistance of counsel.  Id. "'Hindsight, of course, tells us that the advice to confess ill served the defendant * * *," and that "(p)oor tactics of experienced counsel, however, even with disastrous result, may hardly be considered lack of due process * * *.'" *State v. Clayton*, 62 Ohio St.2d 45, 48, 402 N.E.2d 1189 (1980) (*quoting United States v. Denno*, 313 F.2d 364 (2nd Cir.1963), *certiorari denied* 372 U.S. 978, 83 S.Ct. 1112, 10 L.Ed.2d 143.

{¶71}  As we have discussed in our disposition of Hernandez's First Assignment of Error, Mr. Hildebrand identified Hernandez as participating in the crimes.  Further,

Hernandez's own words in the form of her recorded telephone conversations while in jail linked her to the crimes. Photographic evidence documented Hernandez's presence and corroborated Mr. Hildebrand's testimony. Finally, testimony from a former cellmate of Hernandez was introduced that related Hernandez's comments admitting her participation in the crimes. Thus, there was sufficient evidence presented linking Hernandez to the crimes in the absence of Mr. Yosick's testimony.

{¶72} Accordingly, even assuming arguendo counsel's failure to request the jury instruction on accomplice testimony had been deficient, Hernandez cannot establish prejudice under *Strickland.* She has failed to establish a reasonable probability that but for counsel's allegedly deficient performance, the jury would have acquitted her. *See, e.g., State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 67. *State v. Mammone,* 139 Ohio St.3d 1051, 2014-Ohio-1942, 13 N.E.3d 1051, ¶157.

{¶73} Accordingly, we find trial counsel's failure to request a jury instruction on accomplice testimony did not rise to a level that adversely affected Hernandez's substantial rights and did not deprive her of a fair trial.

{¶74} Hernandez's Third Assignment of Error is overruled.

{¶75}  The judgment of the Richland County Court of Common Pleas is affirmed.


By Gwin, P.J.,

Hoffman, J., and

Wise, John, J., concur